**No. 26-2591**

**UNITED STATES COURT OF APPEALS**

**FOR THE EIGHTH CIRCUIT**

**UNITED STATES OF AMERICA,**

Appellee,

vs.

**ADOLPH AKWE LAWRENCE,**

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

Hon. Peter D. Welte, Chief Judge

Case No. 3:22-cr-69

---

**APPELLANT'S OPENING BRIEF**

---

**Ryan D. Sandberg (ID #05999)**
**PRINGLE & HERIGSTAD, P.C.**
P.O. Box 1000
Minot, ND 58702-1000
Telephone: (701) 852-0381
rsandberg@pringlend.com

**ATTORNEY FOR APPELLANT**
**ADOLPH AKWE LAWRENCE**

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This is a direct criminal appeal taken under a conditional plea preserved by Federal Rule of Criminal Procedure 11(a)(2). The appeal arises out of a March 8, 2022 traffic stop in Fargo, North Dakota, that produced approximately 3,000 fentanyl pills hidden inside an inexpensive DVD player inside a sealed FedEx package addressed to a third party. The District Court denied two motions to suppress: the first challenging the duration of the stop, the credibility of the marijuana-odor probable cause finding, and the warrantless package search; the second challenging the warrantless collection and use of Automatic License Plate Reader (ALPR) data.

The appeal raises significant Fourth Amendment questions, including a question of first impression in this Circuit regarding the constitutionality of warrantless ALPR data acquisition. Because the ALPR question involves emerging technology, has not been squarely decided by this Court, and turns on the interplay of *Carpenter v. United States*, 585 U.S. 296 (2018), and *United States v. Knotts*, 460 U.S. 276 (1983), oral argument will materially aid the Court's decisional process. Counsel respectfully requests twenty (20) minutes of oral argument per side.

**TABLE OF CONTENTS**

Summary of the Case and Request for Oral Argument ........................................... i
Table of Contents ........................................................................................ ii
Table of Authorities ..................................................................................... iv
Jurisdictional Statement .................................................................................. 1
Statement of the Issues.................................................................................... 2
Statement of the Case....................................................................................... 4
I. Nature of the Case and Course of Proceedings........................................ 4
II. Pre-Stop Investigation, ALPR Surveillance, and Pretextual Directive ..... 6
III. The March 8, 2022 Traffic Stop ............................................................. 8
IV. Procedural History of the Suppression Motions .................................... 12
Summary of the Argument................................................................................ 14
Argument......................................................................................................... 17
I. Standard of Review ................................................................................ 17
II. The District Court Erred in Denying the First Motion to Suppress (R. Doc. 323) ........................................................................................ 17
A. The traffic stop was unreasonably prolonged in violation of Rodriguez v. United States.................................................................. 17
B. The District Court committed clear error in crediting Officer Novacek's marijuana-odor testimony ............................................... 22
C. The package was a sealed mail item entitled to heightened Fourth Amendment protection that the automobile exception does not displace ........................................................................................ 29
III. The District Court Erred in Denying the Second Motion to Suppress (R. Doc. 381) ........................................................................................ 32
A. The warrantless collection and querying of historical ALPR data was a Fourth Amendment search under Carpenter and Jones ............ 32
B. The independent source doctrine does not save the evidence ....... 39
C. The collective knowledge doctrine cannot launder the underlying constitutional violation ................................................................. 40
IV. Suppression Is the Required Remedy................................................... 41
Conclusion ...................................................................................................... 43
Certificate of Compliance ................................................................................ 44

Certificate of Service ....................................................................................45
Addendum (filed separately under 8th Cir. R. 28A(g)).....................................Add.

## TABLE OF AUTHORITIES

**Supreme Court Cases**

*Byrd v. United States*, 584 U.S. 395 (2018)

*California v. Acevedo*, 500 U.S. 565 (1991)

*Carpenter v. United States*, 585 U.S. 296 (2018)

*Chatrie v. United States*, 609 U.S. ___, 146 S. Ct. 2193 (2026)

*Davis v. United States*, 564 U.S. 229 (2011)

*Ex parte Jackson*, 96 U.S. 727 (1878)

*Griffith v. Kentucky*, 479 U.S. 314 (1987)

*Kyllo v. United States*, 533 U.S. 27 (2001)

*Mapp v. Ohio*, 367 U.S. 643 (1961)

*Murray v. United States*, 487 U.S. 533 (1988)

*Rodriguez v. United States*, 575 U.S. 348 (2015)

*Scott v. Harris*, 550 U.S. 372 (2007)

*Terry v. Ohio*, 392 U.S. 1 (1968)

*United States v. Jones*, 565 U.S. 400 (2012)

*United States v. Knotts*, 460 U.S. 276 (1983)

*United States v. Leon*, 468 U.S. 897 (1984)

*United States v. Ross*, 456 U.S. 798 (1982)

*United States v. Van Leeuwen*, 397 U.S. 249 (1970)

*Wong Sun v. United States*, 371 U.S. 471 (1963)

**Eighth Circuit Cases**

*United States v. Baez*, 983 F.3d 1029 (8th Cir. 2020)

*United States v. Beard*, 708 F.3d 1062 (8th Cir. 2013)

*United States v. Betts*, 88 F.4th 769 (8th Cir. 2023)

*United States v. Forjan*, 66 F.4th 739 (8th Cir. 2023)

*United States v. Heath*, 58 F.3d 1271 (8th Cir. 1995)

*United States v. Magallon*, 984 F.3d 1263 (8th Cir. 2021)

*United States v. Rederick*, 65 F.4th 961 (8th Cir. 2023)

*United States v. Robinson*, 664 F.3d 701 (8th Cir. 2011)

*United States v. Smith*, 789 F.3d 923 (8th Cir. 2015)

*United States v. Sparks*, 37 F. App'x 826 (8th Cir. 2002)

*United States v. Thompson*, 533 F.3d 964 (8th Cir. 2008)

*United States v. Williams*, 955 F.3d 734 (8th Cir. 2020)

*United States v. Wright*, 739 F.3d 1160 (8th Cir. 2014)

**<u>Other Federal and State Authorities</u>**

*Commonwealth v. McCarthy*, 484 Mass. 493, 142 N.E.3d 1090 (2020)

*Love v. State*, 73 N.E.3d 693 (Ind. 2017)

*State v. Boger*, 2021 ND 152, 963 N.W.2d 742

*United States v. Quiroz*, 57 F. Supp. 2d 805 (D. Minn. 1999)

**<u>Constitutional and Statutory Provisions</u>**

U.S. Const. amend. IV

18 U.S.C. § 2

18 U.S.C. § 3231

21 U.S.C. § 841(a)(1)

21 U.S.C. § 841(b)(1)(A)

21 U.S.C. § 841(b)(1)(B)(viii)

21 U.S.C. § 846

28 U.S.C. § 636(b)(1)

28 U.S.C. § 1291

**<u>Rules</u>**

Fed. R. App. P. 4(b)

Fed. R. App. P. 28

Fed. R. App. P. 32

Fed. R. Crim. P. 11(a)(2)

Fed. R. Crim. P. 59

8th Cir. R. 28A

## JURISDICTIONAL STATEMENT

The District Court for the District of North Dakota had original jurisdiction under 18 U.S.C. § 3231 because Mr. Lawrence was charged with offenses against the laws of the United States. The District Court entered final judgment on August 5, 2026 (R. Doc. 443; Add. 1), upon Mr. Lawrence's conditional plea of guilty entered under Federal Rule of Criminal Procedure 11(a)(2). Mr. Lawrence filed a timely Notice of Appeal on August 10, 2026 (R. Doc. 446), within the 14-day period set by Federal Rule of Appellate Procedure 4(b)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291. The conditional plea expressly reserved the right to appeal the denials of the two motions to suppress (R. Docs. 323 & 381). (R. Doc. 405, ¶¶ 4, 21.) The reservation was made in writing, with the consent of the government and the approval of the District Court, as Rule 11(a)(2) requires. (Change of Plea Tr. (R. Doc. 449), p. 6-7.)

## STATEMENT OF THE ISSUES

**I. Whether the District Court erred in denying Mr. Lawrence's first motion to suppress (R. Doc. 323) where Officer Novacek prolonged a routine expired-registration stop with off-mission database queries about a third party's name on a package, where the marijuana-odor probable cause finding rested on testimony that conflicts with the body camera and dash camera video, and where the warrantless search of a sealed FedEx package addressed to a third party violated the heightened privacy protection mail packages enjoy under the Fourth Amendment.**

Apposite cases:

*Rodriguez v. United States*, 575 U.S. 348 (2015)
*United States v. Betts*, 88 F.4th 769 (8th Cir. 2023)
*United States v. Smith*, 789 F.3d 923 (8th Cir. 2015)
*United States v. Van Leeuwen*, 397 U.S. 249 (1970)

**II. Whether the District Court erred in denying Mr. Lawrence's second motion to suppress (R. Doc. 381) where the Fargo Police Department's warrantless acquisition, retention, and querying of historical ALPR data, used to track the red Kia at least ten times in a single month at a private residence, constituted a Fourth Amendment search under *Carpenter*, where the independent source doctrine cannot apply because Detective Heller's investigative path was prompted in part by the ALPR query, and where the**

**collective knowledge doctrine cannot retroactively legitimize an underlying constitutional violation.**

Apposite cases:

*Chatrie v. United States*, 609 U.S. ___, 146 S. Ct. 2193 (2026)
*Carpenter v. United States*, 585 U.S. 296 (2018)
*United States v. Jones*, 565 U.S. 400 (2012)
*Murray v. United States*, 487 U.S. 533 (1988)

## STATEMENT OF THE CASE

### I. Nature of the Case and Course of Proceedings

Adolph Akwe Lawrence was charged in a Second Superseding Indictment, filed March 7, 2024, with conspiracy and substantive controlled substance offenses, money laundering conspiracy, criminal contempt, obstruction of justice, and witness tampering. (R. Doc. 298.) The charges arose from an alleged fentanyl distribution operation centered in Fargo, North Dakota, with ties to California.

The evidentiary core of the case is the fentanyl seized during a March 8, 2022 traffic stop, when Officer Jonathan Novacek of the Fargo Police Department (FPD) opened a sealed FedEx package on the front passenger seat of the red Kia Mr. Lawrence was driving and discovered approximately 3,000 fentanyl pills concealed inside an inexpensive DVD player. (R. Doc. 375, at p.9-10; Add. 23-24.)

Mr. Lawrence filed two motions to suppress.

The first motion (R. Doc. 323), filed September 12, 2024, with a supporting memorandum (R. Doc. 324), challenged: (1) the prolongation of the stop while Officer Novacek queried a third party's name found on the package; (2) the credibility of the officer's marijuana-odor testimony, which materialized eighteen minutes into the stop and only after the officer's third approach to the vehicle; and (3) the warrantless search of the package. After an evidentiary hearing on February 20, 2025, Magistrate Judge Senechal issued a Report and Recommendation on

May 15, 2025 (R. Doc. 375), recommending denial. Mr. Lawrence filed timely objections (R. Doc. 376). On August 29, 2025, Chief Judge Welte adopted the Report and Recommendation and denied the motion. (R. Doc. 386; Add. 9.)

The second motion (R. Doc. 381), filed August 19, 2025, with a supporting memorandum (R. Doc. 382), focused on the warrantless collection, retention, and querying of ALPR data by FPD that had tracked the red Kia at least ten times during February 2022, and renewed the package-search challenge on a separate constitutional footing. After a December 11, 2025 evidentiary hearing at which Detective Joshua Heller was the sole witness, Magistrate Judge Senechal issued a Report and Recommendation on January 15, 2026 (R. Doc. 401; Add. 49). Mr. Lawrence filed timely objections (R. Doc. 402). On March 18, 2026, Chief Judge Welte adopted the Report and Recommendation and denied the second motion. (R. Doc. 404; Add. 45.)

On April 27, 2026, Mr. Lawrence entered a conditional plea of guilty under Federal Rule of Criminal Procedure 11(a)(2) to Count One (drug conspiracy) and Count Two (possession with intent to distribute), expressly reserving the right to appeal the denials of both motions to suppress. (R. Doc. 405, ¶¶ 4, 21; R. Doc. 406.) The District Court accepted the conditional plea. (Change of Plea Tr., p. 24.) The remaining counts of the Second Superseding Indictment were dismissed pursuant to the Plea Agreement, and Mr. Lawrence agreed to forfeiture as set forth

in the indictment. The District Court imposed sentence on August 5, 2026, and entered the Criminal Judgment on August 5, 2026 (R. Doc. 443). This timely appeal followed.

## II. Pre-Stop Investigation, ALPR Surveillance, and Pretextual Directive

In December 2021, Detective Heller, then assigned to the United States Marshals Service High Plains Fugitive Task Force, arrested Malik Chipps on a probation violation warrant. (Suppression Hearing Tr., Feb. 20, 2025 (R. Doc. 364), p. 21.) Chipps possessed fentanyl pills and two firearms, and identified his source of supply as Bayo Adrian Saibu (a codefendant in this case), with Bayo's source described as a shorter black male with dreadlocks who drove a red Kia with California plates. (Suppression Hearing Tr., Feb. 20, 2025, p. 21.) Detective Heller identified that male as Mr. Lawrence's brother, Ennis Fitzgerald Lawrence. (R. Doc. 375, at p.3.)

Significantly, Chipps never identified Mr. Lawrence. Detective Heller conceded at the suppression hearing that, at the time of his interview with Chipps, Mr. Lawrence was not even on his radar. (Suppression Hearing Tr., Feb. 20, 2025, p. 45; R. Doc. 366, at p.18.) Officer Novacek likewise testified at the hearing that he knew nothing about the targets of the investigation and that Detective Heller's information was, in his words, “very, very loose.” (Suppression Hearing Tr., Feb. 20, 2025, p. 62; Add. 70.)

On March 1, 2022, Detective Heller saw Ennis at a Fargo Scheels store. (Suppression Hearing Tr., Feb. 20, 2025, p. 26.) Law enforcement followed the red Kia to a Fargo apartment building at 3102 3rd Street North.

Then comes the disputed surveillance. At ATF Special Agent Bradt's request, Detective Heller queried the red Kia's California license plate through the FPD's Axon ALPR database for license plate reads in February. (Suppression Hearing Tr., Feb. 20, 2025, p. 38; Suppression Hearing Tr., Dec. 11, 2025 (R. Doc. 399), p. 13-14; Add. 83-84.) The query returned at least ten ALPR hits of the red Kia parked at 3102 3rd Street North during February 2022. (Suppression Hearing Tr., Dec. 11, 2025, p. 14.) That historical, retroactive surveillance was performed without a warrant, without probable cause, and without any individualized judicial check on the government's incursion into Mr. Lawrence's movements.

On March 8, 2022, officers conducted live surveillance at the same Fargo apartment building. They saw Mr. Lawrence enter the red Kia and drive it to a residence on 16th Avenue South used by codefendant Ethmonia Korlu Barclay. (R. Doc. 375, at p.4.) Detective Heller then radioed the FPD patrol unit and asked any officer who saw the red Kia to attempt a traffic stop if there was reason to do so. (Suppression Hearing Tr., Feb. 20, 2025, p. 33.)

Officer Novacek testified Detective Heller specifically asked him to "find a reason, my own reason, to make the traffic stop," which Officer Novacek conceded

is common in narcotics investigations. (Suppression Hearing Tr., Feb. 20, 2025, p. 62.) Detective Heller stated the purpose of the requested stop was to identify the driver of the red Kia. (Suppression Hearing Tr., Feb. 20, 2025, p. 33.) The pretext was thus baked into the directive itself.

**III. The March 8, 2022 Traffic Stop**

Officer Novacek located the red Kia, ran the plate, and learned the registration had been expired by several days. (Suppression Hearing Tr., Feb. 20, 2025, p. 62.) Although Officer Novacek had been told by Detective Heller about a fentanyl trafficking investigation in only the most general terms, Officer Novacek had no information identifying Mr. Lawrence as a target or any particularized suspicion that the red Kia contained contraband. (Suppression Hearing Tr., Feb. 20, 2025, p. 62, 73.)

Officer Novacek stopped the vehicle on 19th Avenue North in Fargo. Three videos recorded the stop and were received in evidence at the suppression hearing: (1) Officer Novacek's body camera, marked as Defendant's Exhibit A and filed at R. Doc. 329 (conventionally filed), cited herein as "Defense Exh. A" and described in the text as the "Body Cam"; (2) the forward-facing dash camera on Officer Novacek's squad car, marked as Government's Exhibit 1 and filed at R. Doc. 334 (conventionally filed), cited herein as "Government Exh. 1" and described in the text as the "Dash Cam"; and (3) the rear interior camera in the squad car, marked

as Government's Exhibit 2 and also filed at R. Doc. 334 (conventionally filed), cited herein as "Government Exh. 2" and described in the text as the "Interior Cam." All three discs have been forwarded to this Court by the district court clerk.

**First approach (about 15 seconds).** Officer Novacek approached the passenger side, explained the reason for the stop, and asked Mr. Lawrence for license, registration, and insurance. Mr. Lawrence stated he did not have his license. Officer Novacek invited Mr. Lawrence out of the vehicle to view the expired plate, performed a pat-down, and placed Mr. Lawrence in the back seat of the squad car. (Suppression Hearing Tr., Feb. 20, 2025, p. 65-68; Defense Exh. A at 00:00-00:50; Government Exh. 1 at 01:06-01:21.) The Dash Cam shows Officer Novacek standing close to the passenger side of the red Kia, in immediate proximity to the open front passenger window, with his body squarely facing the open window. (Government Exh. 1 at 01:06-01:21.) Officer Novacek did not smell marijuana. (Suppression Hearing Tr., Feb. 20, 2025, p. 106-07.)

**Mission complete.** Mr. Lawrence identified himself as Adolph Akwe Lawrence and identified his cousin, Mamawa Christiana Saibu, as the owner of the vehicle. (R. Doc. 375, at p.6.) The dispatch query showed Mr. Lawrence's driver's license was current. (Government Exh. 1 at 08:40-10:33.) Officer Novacek warned Lawrence about the need to carry his driver's license and to get the vehicle

registration figured out but did not issue a citation. (Suppression Hearing Tr., Feb. 20, 2025, p. 76; Government Exh. 1 at 12:12-13:16.)

**Second approach.** Officer Novacek and Mr. Lawrence walked back to the red Kia for the insurance documents. (Defense Exh. A at 12:25-13:20; Government Exh. 1 at 13:35-14:20.) The Dash Cam shows Officer Novacek standing behind Mr. Lawrence at the rear right passenger area of the red Kia while Mr. Lawrence opens the front passenger door and retrieves the insurance documents. The Officer is further from the open passenger door than he was on the first approach. (Government Exh. 1 at 13:35-14:20.) Officer Novacek again did not smell marijuana. (Suppression Hearing Tr., Feb. 20, 2025, p. 100.)

**The unrelated investigation.** Officer Novacek took the insurance papers back to his squad car. While there, he ran the FPD computer database for Korlu Barclay, the name of the addressee on the FedEx package on the front passenger seat, and called Detective Heller to relay the name. (R. Doc. 375, at p.7-9.) The query returned no results. The District Court conceded: "It is not possible to precisely determine how much of the four minutes was spent on a query of the name on the package and how much of that time was spent reviewing the insurance documents Lawrence had given him." (R. Doc. 375, at p.25.) Detective Heller then recognized Korlu Barclay as the middle name of codefendant Ethmonia Barclay, who Mr. Lawrence had identified as the aunt with whom he was staying. (R. Doc.

375, at p.9.) The mission of the stop, an expired registration, was at this point complete, and the question of issuing a citation had already been resolved against issuance.

**Third approach and the late-arriving odor.** Eighteen minutes into the stop, on his third approach to the red Kia and only after he had completed his off-mission package query and call, Officer Novacek for the first time claimed to smell marijuana. (Suppression Hearing Tr., Feb. 20, 2025, p. 79; Defense Exh. A at 17:32-18:30; Government Exh. 1 at 18:31-19:33.) The Dash Cam shows Officer Novacek returning to a position close to the passenger side of the red Kia, in immediate proximity to the open passenger window, in materially the same body position he occupied during the first approach. (Compare Government Exh. 1 at 01:06-01:21 with Government Exh. 1 at 18:31-19:33.) He testified that wind, cold, the angle of approach, and squad-car positioning explained why he had not detected marijuana on his first two approaches. (Suppression Hearing Tr., Feb. 20, 2025, p. 65-68.) He was unable to identify whether the odor was burnt or unburnt and acknowledged the source could have been shake on the floorboard. (R. Doc. 375, at p.9.) The Body Cam shows Mr. Lawrence standing within inches of Officer Novacek for extended portions of the first eighteen minutes, including in the wind shelter of the squad car, where Officer Novacek smelled nothing.

**The search.** Officer Novacek searched the vehicle, and then opened the sealed FedEx package addressed to Korlu Barclay at 3301 16th Avenue South, Apt. 202, Fargo, ND, with sender Abica Supplies of Sacramento, California. (R. Doc. 382, at p.2-3.) Inside the package was a low-priced DVD player. Inside the DVD player, Officer Novacek discovered foil-wrapped packets of fentanyl pills. (R. Doc. 375, at p.10.)

Backup Officer Joshua Marvig opened the driver's door later in the search and stated he immediately smelled a strong odor of marijuana. (Suppression Hearing Tr., Feb. 20, 2025, p. 125-26.) Officer Novacek located shake on the floorboard and a cylindrical ashtray containing cigarillos. Neither the shake nor the cigarillos was seized. (R. Doc. 375, at p.8-9.) Audio on the body camera was turned off for a portion of the search. (Defense Exh. A at 34:22-37:51.) No marijuana, smokable or otherwise, was ever recovered from the vehicle or from Mr. Lawrence.

## IV. Procedural History of the Suppression Motions

Mr. Lawrence litigated and preserved the suppression issues at every stage. He filed pre-hearing briefs (R. Docs. 324 & 382), cross-examined the officers and Detective Heller, presented testimony from his cousin Saibu, filed a post-hearing brief (R. Doc. 366), filed timely written objections to both Reports and

Recommendations (R. Docs. 376 & 402), and entered a conditional plea preserving these issues (R. Doc. 405, ¶¶ 4, 21). The issues are properly before this Court.

## SUMMARY OF THE ARGUMENT

This appeal asks this Court to enforce the Fourth Amendment's basic limits on traffic stops, on the credibility analysis underpinning probable cause, on the warrantless opening of mailed packages addressed to third parties, and on the warrantless aggregation of historical location data through ALPR systems.

**The first motion to suppress should have been granted for three independent reasons.**

First, Officer Novacek prolonged the traffic stop in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015). The mission of the stop, an expired registration, was complete when Officer Novacek decided not to issue a citation. Officer Novacek then turned to off-mission tasks, including a database query of the third-party name on the FedEx package, telephone calls to Detective Heller about that name, and waiting for callbacks. That detour was not supported by reasonable suspicion specific to Mr. Lawrence and was not within the stop's mission. The collective knowledge doctrine cannot rescue this prolongation because the information conveyed to Officer Novacek by Detective Heller was, in Officer Novacek's own words, "very, very loose," targeted Ennis Lawrence (not Adolph), and did not amount to reasonable suspicion that the red Kia presently contained contraband.

Second, the District Court's finding that Officer Novacek's marijuana-odor testimony was credible is clear error in light of the body camera and dash camera videos, which contradict the testimony in material respects. *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995). Officer Novacek did not detect marijuana when he was inches from Mr. Lawrence inside the wind-sheltered squad car or during the pat-down. His explanation that wind, position, and cold suddenly resolved themselves on the third approach is undermined by the videos. Without a credible odor, there was no probable cause.

Third, even assuming probable cause to search the red Kia, the warrantless opening of the sealed FedEx package addressed to a third party violated the heightened Fourth Amendment protection mail enjoys. *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970). The automobile exception under *California v. Acevedo*, 500 U.S. 565 (1991), should not be read to extinguish the special privacy interest a third-party addressee, and a transporter on her behalf, retains in sealed mail.

**The second motion to suppress should have been granted because the warrantless ALPR surveillance was a Fourth Amendment search under Carpenter.**

In *Carpenter v. United States*, 585 U.S. 296 (2018), and the Supreme Court's recent decision in *Chatrie v. United States*, 609 U.S. ___, 146 S. Ct. 2193 (2026),

the Supreme Court held that warrantless acquisition of historical, retrospective location data is a Fourth Amendment search, “regardless of ‘the quality or quantity of information’ the government obtains.” *Chatrie*, 146 S. Ct. at 2210. The Fargo Police Department's warrantless acquisition of historical ALPR data, retroactively cataloging at least ten parked-vehicle hits at a single private residence over a single month, is precisely the dragnet against which Justice Sotomayor warned in *United States v. Jones*, 565 U.S. 400, 415-16 (2012) (Sotomayor, J., concurring). The independent source doctrine does not apply because the investigative path was, by Detective Heller's own testimony, prompted in part by the ATF's ALPR query request. *Murray v. United States*, 487 U.S. 533, 542 (1988). And the collective knowledge doctrine cannot retroactively cure a constitutional violation in the underlying surveillance.

Suppression is the only remedy that vindicates these Fourth Amendment interests and serves the deterrence purpose recognized in *Davis v. United States*, 564 U.S. 229, 236-37 (2011). This Court should reverse the denials of both motions to suppress, vacate the conviction, and remand with instructions to grant suppression and permit Mr. Lawrence to withdraw his conditional plea under Rule 11(a)(2).

## ARGUMENT

### I. Standard of Review

This Court reviews a district court's denial of a motion to suppress under a mixed standard. Factual findings are reviewed for clear error, and legal conclusions are reviewed *de novo*. *United States v. Rederick*, 65 F.4th 961, 966 (8th Cir. 2023); *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021).

Whether a traffic stop was unreasonably prolonged in violation of *Rodriguez* is a legal question reviewed *de novo*, with the underlying facts reviewed for clear error. *Rederick*, 65 F.4th at 966. Whether probable cause existed is reviewed *de novo*. *United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013). Credibility determinations are reviewed for clear error. *United States v. Wright*, 739 F.3d 1160, 1167 (8th Cir. 2014) (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995)). Whether warrantless surveillance constitutes a Fourth Amendment search is a legal question reviewed *de novo*. *Rederick*, 65 F.4th at 966.

### II. The District Court Erred in Denying the First Motion to Suppress (R. Doc. 323)

#### A. The traffic stop was unreasonably prolonged in violation of Rodriguez v. United States

The Fourth Amendment guarantees [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop is a seizure within the meaning of

the Fourth Amendment. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023). A stop's tolerable duration is determined by its mission: to address the traffic violation that warranted the stop and attend to related safety concerns. *Rodriguez*, 575 U.S. at 354.

The mission includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "[A]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," but he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355 (citation omitted). Even a *de minimis* extension to pursue an off-mission task is unconstitutional. *Id.* at 357.

#### 1. The mission ended when Officer Novacek decided not to issue a citation.

The traffic violation underlying the stop was a recently expired California registration. Officer Novacek confirmed Mr. Lawrence's identity, learned that his driver's license was current, and affirmatively decided not to issue a citation, instead warning Lawrence about the need to carry his driver's license and to get the vehicle registration figured out. (Suppression Hearing Tr., Feb. 20, 2025, p. 76; Government Exh. 1 at 12:12-13:16.) That moment, captured in the dash camera video, marked the end of the stop's mission. At that point, the constitutional

foundation for continued seizure dissolved. *Rodriguez*, 575 U.S. at 350-51 ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.").

The traffic-mission analysis is straightforward, almost like checking out at a grocery store. Once the receipt has been printed and the cashier has handed it over, the customer's reason for being at the register is over. If the cashier then asks the customer to wait while she investigates whether the customer's neighbor has overdue library books, the customer is being detained without justification. The mission has ended, even if the cashier's questions are quick.

**2. Officer Novacek's database query and call about the third-party package name was off-mission.**

Once the registration mission was resolved, Officer Novacek shifted his focus from the traffic infraction to the ongoing drug trafficking investigation by querying the name Korlu Barclay (the addressee of the FedEx package on the front passenger seat) through FPD's database and conveying that name to Detective Heller. That is not, by any plausible reading of *Rodriguez*, an ordinary inquiry incident to an expired-tag stop. *Rodriguez*, 575 U.S. at 355.

The Magistrate Judge found that "[i]t is not possible to precisely determine how much of the four minutes was spent on a query of the name on the package and how much of that time was spent reviewing the insurance documents." (R. Doc. 375, at p.25.) That uncertainty cuts in Mr. Lawrence's favor, not against him.

The government bears the burden of justifying a warrantless seizure, including the burden of demonstrating that prolongation was justified. *United States v. Forjan*, 66 F.4th 739, 748 (8th Cir. 2023); *see also Rodriguez*, 575 U.S. at 357. When the record is unclear about how much time an off-mission task consumed, the government has not met its burden.

**3. The collective knowledge doctrine cannot rescue the prolongation.**

The District Court invoked the collective knowledge doctrine to bridge the gap between Officer Novacek's actual knowledge and the broader investigation by Detective Heller. (R. Doc. 386, at p.3-4.) Under that doctrine, probable cause to search may be based on the officers' collective knowledge as long as there is some degree of communication. *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011); *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008).

The doctrine does not, however, manufacture reasonable suspicion that does not exist in the first place. Detective Heller's pre-stop knowledge as to Mr. Lawrence (as opposed to his brother Ennis) was thin to nonexistent. Detective Heller conceded Mr. Lawrence was not on his radar at the time of the Chipps interview. (Suppression Hearing Tr., Feb. 20, 2025, p. 45.) Officer Novacek testified the information he received was "very, very loose," and that he knew nothing about the targets of the investigation. (Suppression Hearing Tr., Feb. 20, 2025, p. 62.) The radio request was to find a reason for a stop, not to convey

particularized facts establishing reasonable suspicion that this driver was committing a present offense.

This case differs from *Robinson*, where the imputed knowledge included specific, particularized information about a specific suspect's involvement in a specific offense. 664 F.3d at 703-04. Here, the imputed knowledge was, at best, that the red Kia had been seen at addresses associated with Ennis (Mr. Lawrence's brother) and Barclay. That suspicion attached to Ennis and the vehicle, not to Mr. Lawrence and not to the contents of the package on the seat. The collective knowledge doctrine cannot bootstrap an officer past *Rodriguez* merely because investigators elsewhere harbor suspicion about a related person.

Said another way, the collective knowledge doctrine is like a relay race. To pass the baton, the first runner has to be holding it. Detective Heller could only impute reasonable suspicion he himself possessed. He did not possess reasonable suspicion that this driver, in this vehicle, at this time, was presently committing an offense related to the package. The imputed knowledge was about a brother, an apartment, and a vehicle's prior whereabouts, not about Mr. Lawrence's present commission of any offense.

#### 4. The unrelated package query was not within the stop's mission and was not justified by reasonable suspicion.

Even assuming Officer Novacek harbored a hunch that the package was suspicious, an “inchoate and unparticularized suspicion or ‘hunch’” does not

satisfy *Terry v. Ohio*, 392 U.S. 1, 27 (1968). *See United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015). A package on a seat, with a name unfamiliar to the officer, is not an articulable basis for a *Rodriguez* extension. If it were, every package in every car could justify off-mission database queries, and *Rodriguez* would be a hollow doctrine.

### B. The District Court committed clear error in crediting Officer Novacek's marijuana-odor testimony

The Magistrate Judge accepted Officer Novacek's testimony that he detected marijuana for the first time on his third approach. (R. Doc. 375, at p.26-28.) Chief Judge Welte agreed, citing the dash camera footage. (R. Doc. 386, at p.2-3.) On this record, however, the videos contradict the testimony in material ways and the surrounding circumstances render the story implausible. *Wright*, 739 F.3d at 1167.

#### 1. The applicable standard.

Credibility findings are usually granted significant deference, but this Court has long held that they will be set aside where the story is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," or where extrinsic evidence, such as video, contradicts the witness's story. *Heath*, 58 F.3d at 1275. Video evidence of the actual event is exactly the kind of extrinsic evidence that can override the trial court's credibility determination. The Supreme Court has held as much in the summary judgment context: "When opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The same principle applies in a suppression context. The North Dakota Supreme Court squarely adopted that approach in *State v. Boger*, 2021 ND 152, 963 N.W.2d 742, where the court reversed a district court's denial of a motion to suppress entered after a conditional plea because the officer's body camera footage indisputably contradicted his testimony that the defendant's license plate was unilluminated. *Id.* ¶¶ 16-18. Quoting the Indiana Supreme Court, the *Boger* court explained: "[W]here the video evidence indisputably contradicts the trial court's findings, relying on such evidence and reversing the trial court's findings do not constitute reweighing." *Id.* ¶ 17 (quoting *Love v. State*, 73 N.E.3d 693, 699 (Ind. 2017)). That is precisely the posture here.

**2. Officer Novacek's account is internally inconsistent and implausible.**

Officer Novacek's testimony rests on the proposition that wind, cold, angle of approach, and the closed driver's window prevented marijuana detection until his third approach. (Suppression Hearing Tr., Feb. 20, 2025, p. 65-68; Add. 73-76.) But on the second approach, Officer Novacek stood right next to the rear right side passenger door while Mr. Lawrence opened the front passenger door, retrieved the documents, and handed them across. (Suppression Hearing Tr., Feb. 20, 2025, p. 100; Defense Exh. A at 12:25-13:20.) Officer Novacek's body was inside the same

wind shadow as on the third approach. The testimony does not adequately explain why the open door released no detectable odor, but a brief reach across the threshold did.

More fundamentally, the Body Cam shows that Officer Novacek was placed in the same no-wind position relative to Mr. Lawrence, and remained in close-quarters contact with him, for extended portions of the first twelve minutes of the stop without ever detecting an odor of marijuana. The Body Cam record is as follows:

- **Defense Exh. A at 01:01.** Officer Novacek directs Mr. Lawrence to walk back to the squad car and stand on the front passenger side.
- **Defense Exh. A at 01:03-01:07.** Officer Novacek pat-searches Mr. Lawrence for weapons, in direct body-to-body contact.
- **Defense Exh. A at 01:13-01:18.** Mr. Lawrence sits down in the right rear passenger side of the squad car. Officer Novacek stands at the open door, speaks to Mr. Lawrence at close range, and shuts the door. This is the exact same location and physical posture Officer Novacek would later occupy at Defense Exh. A at 33:19-33:28, when he claimed the odor of marijuana on Mr. Lawrence was so strong that he could be heavily smelled. Officer Novacek said nothing about marijuana at 01:13-01:18.

- **Defense Exh. A at 01:26 to 12:16.** Officer Novacek enters his squad car and sits in the driver's seat while Mr. Lawrence remains in the back. The two carry on a conversation for nearly eleven minutes. The cage divider between the front and back seats has an open communicating window: the audio of Mr. Lawrence's voice on the Body Cam confirms this, because the conversation would not be audible through a closed barrier. The squad car is sealed against the wind. Officer Novacek does not, at any point during this nearly eleven-minute interior conversation, mention any odor of marijuana.
- **Defense Exh. A at 12:21-12:24.** Officer Novacek walks to the rear passenger door and opens it to let Mr. Lawrence out. He is now in the same no-wind position by the patrol vehicle door. He says nothing about marijuana.
- **Defense Exh. A at 18:50-19:01.** After his third approach to the red Kia and his claimed first detection of marijuana, Officer Novacek places Mr. Lawrence back in the squad car. He tells Mr. Lawrence that now that the wind is blocked he can smell marijuana coming from him. But the audio confirms the wind is still clearly audible, and Mr. Lawrence is not yet fully seated. The supposed wind-block

explanation is therefore not factually supported by the Officer's own recording.

- **Defense Exh. A at 33:19-33:28.** Officer Novacek opens the right rear passenger door, places Mr. Lawrence in handcuffs, and tells him he smells heavily like weed. He is in the same physical position relative to Mr. Lawrence as he was at 01:13-01:18, when he said nothing about marijuana.

The Dash Cam, viewed from above and behind the squad car, provides an independent angle on Officer Novacek's three approaches to the red Kia. That footage further undermines his explanation that position and angle prevented detection until the third approach:

- **Government Exh. 1 at 01:06-01:21 (first approach).** Officer Novacek is shown standing close to the passenger side of the red Kia, in immediate proximity to the open front passenger window, while Mr. Lawrence speaks with him from inside the vehicle. The Officer's body is squarely facing the open window.
- **Government Exh. 1 at 13:35-14:20 (second approach).** Officer Novacek is shown standing behind Mr. Lawrence at the rear right passenger area of the red Kia while Mr. Lawrence opens the front passenger door and retrieves the insurance documents. The Officer is

further from the open door than he was on the first approach. If, as Officer Novacek testified, his ability to smell marijuana was affected by his distance and angle relative to the open passenger door, the second approach is the approach during which detection should have been most difficult, not the first.

- **Government Exh. 1 at 18:31-19:33 (third approach).** Officer Novacek is shown returning to a position close to the passenger side of the red Kia, in immediate proximity to the open passenger window, as he hands the insurance documents back to Mr. Lawrence. His body position is materially the same as his position during the first approach, which is the approach during which he conceded he detected no odor.

The Dash Cam therefore turns the Officer's own position-and-angle explanation against him. The position-sensitive variable on which his testimony depends is not present in the recorded angles. On the first and third approaches, the Officer was close to the open passenger window in materially the same posture. He claims a strong odor only on the third. On the second approach he was further from the open door than at either of the other two approaches. He claims no odor on the second.

The combination of these time-stamped facts is irreconcilable with Officer Novacek's testimony. If the red Kia and Mr. Lawrence reeked of marijuana, Officer Novacek would have smelled it before his third approach. He was in the same no-wind position at 01:13-01:18 and 12:21-12:24. He was inside a sealed squad car cabin with the cage window open for eleven minutes at 01:26-12:16. He pat-searched Mr. Lawrence in body-to-body contact at 01:03-01:07. Backup Officer Marvig, by contrast, testified the odor was "immediately" apparent upon opening the driver's door. (Suppression Hearing Tr., Feb. 20, 2025, p. 125-26.) That those two officers could have such radically different experiences of the same odor, at the same scene, is not credible on this record.

**3. The body camera audio gap further undermines credibility.**

Officer Novacek turned off his body camera audio for a substantial portion of the search. (Defense Exh. A at 34:22-37:51.) An audio gap of that length, in a police-citizen encounter that produced a felony arrest, is not consistent with routine procedure and tends to undermine confidence in officer recollection of events.

**4. The supposedly corroborative shake was never seized.**

The Magistrate Judge relied in part on the presence of shake on the floorboard and Officer Marvig's later detection of marijuana to corroborate Officer Novacek's account. (R. Doc. 375, at p.26-28.) But neither the shake nor the cigarillos was seized as evidence. (R. Doc. 375, at p.8-9.) That is a remarkable

omission. If Officer Novacek had truly detected marijuana, basic evidence-collection practice would have been to seize and preserve the source. The non-seizure leaves the corroborating facts entirely dependent on the officer's later word, with no physical record. This is the kind of internal inconsistency that, especially when combined with the video evidence, takes the case out of *Heath's* almost-impossible-to-reverse heartland.

#### 5. Without a credible odor, no probable cause existed.

This Court has held repeatedly that the odor of marijuana, supported by credible officer testimony, can supply probable cause to search a vehicle and its containers. *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020); *Beard*, 708 F.3d at 1065; *Smith*, 789 F.3d at 929. The corollary is that where the odor testimony is not credible, the probable cause it purports to support evaporates. There is no other independent basis for probable cause to search this vehicle. The expired registration justified the stop, but it did not, on its own, justify a search. The mere presence of a closed package on the front seat, with a name unfamiliar to a roadside officer, does not create probable cause.

### C. The package was a sealed mail item entitled to heightened Fourth Amendment protection that the automobile exception does not displace

Even if probable cause existed to search the red Kia, the warrantless opening of the sealed FedEx package addressed to a third party, and the further disassembly

of the DVD player inside it, exceeded the lawful scope of the automobile exception.

### 1. Mail enjoys special Fourth Amendment protection.

The Supreme Court has long recognized that "[l]etters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles." *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970) (quoting *Ex parte Jackson*, 96 U.S. 727, 733 (1878)). Although *Van Leeuwen* involved postal mail, courts have applied the same protection to private parcel carriers like FedEx and UPS. *See, e.g., United States v. Quiroz*, 57 F. Supp. 2d 805, 813 (D. Minn. 1999).

The privacy interest in sealed mail is dual. The sender has an interest in keeping the contents private from third parties. The addressee has an interest in receiving the contents undisturbed. A person carrying a package addressed to another, like a delivery driver or a recipient's agent, holds the package on behalf of those interests. Allowing officers to open a sealed mail package addressed to a third party simply because the package is in a vehicle subverts that protection.

### 2. Acevedo's automobile-container framework should not be read to extinguish mail's protection.

In *California v. Acevedo*, 500 U.S. 565 (1991), the Supreme Court held that the automobile exception permits officers with probable cause to open closed

containers in a vehicle. The Court did not, however, address sealed mail. *Acevedo's* reasoning rests on the diminished expectation of privacy in vehicles and the mobility of the contraband. Sealed mail does not lose its protected character merely because it is, momentarily, inside a car. *Cf. United States v. Ross*, 456 U.S. 798, 824 (1982) (describing the scope of vehicle searches with reference to the place where contraband may be found).

The Eighth Circuit and others have not ruled that the automobile exception perfectly subsumes the protections recognized in *Van Leeuwen*. To do so would create the perverse incentive: officers wishing to avoid the warrant requirement could simply wait for sealed mail to be carried into a vehicle, and then open it without any process at all. That inversion is incompatible with the Fourth Amendment's design.

**3. The package belonged neither to Mr. Lawrence nor to anyone present at the stop.**

The package was addressed to Korlu Barclay at 3301 16th Avenue South, Apartment 202, Fargo, North Dakota, with sender Abica Supplies of Sacramento, California. (R. Doc. 382, at p.2-3.) Mr. Lawrence was neither sender nor addressee, but he was transporting the package, in the District Court's words, on behalf of others. To borrow an everyday analogy, this is not different in kind from a friend who picks up a sealed Amazon box for a neighbor on the way home and places it on the front seat. The friend's transitory possession does not strip the box

of the Fourth Amendment protections that attached to it as mail in transit, and certainly does not authorize a warrantless opening absent probable cause specific to the package itself. Cf. *Byrd v. United States*, 584 U.S. 395 (2018) (driver in lawful possession and control of a rental car retains a reasonable expectation of privacy in it even though he is not listed on the rental agreement).

#### 4. Probable cause to search the vehicle for marijuana did not extend to opening the sealed FedEx package.

Even if the marijuana-odor justification stood up, the scope of the resulting search is defined by the object of the search and the places in which there is probable cause to believe that it may be found. *Ross*, 456 U.S. at 824. Marijuana shake on the floorboard provided no fair probability that marijuana was inside a sealed FedEx package shipped overnight from California in factory-condition retail packaging. The District Court's conclusion that "[b]ecause a package the size of a DVD player could have contained marijuana, Officer Novacek had probable cause to search the package" (R. Doc. 375, at p.29), turns probable cause into a tautology. Anything that could conceivably hold marijuana, by that reasoning, can be searched. The Fourth Amendment permits no such open-ended license.

## III. The District Court Erred in Denying the Second Motion to Suppress (R. Doc. 381)

### A. The warrantless collection and querying of historical ALPR data was a Fourth Amendment search under Carpenter and Jones

This issue is one of first impression in the Eighth Circuit. No Supreme Court or Eighth Circuit decision has squarely addressed whether the warrantless retention and historical querying of ALPR data is a search under the Fourth Amendment. The Magistrate Judge resolved the question against Mr. Lawrence by analogy to a single unpublished Eighth Circuit decision involving real-time license-plate observation, *United States v. Sparks*, 37 F. App'x 826, 829 (8th Cir. 2002). (R. Doc. 401, at p.16.) The District Court adopted that conclusion, relying on a single district court decision. (R. Doc. 404, at p.2.) That analytical framework is incorrect.

**1. The principles of Carpenter and Jones control.**

In *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court held that the warrantless attachment of a GPS tracker to a vehicle for 28 days was a search. The majority decided the case on a property-based theory, but five Justices, between the Sotomayor and Alito concurrences, reasoned that the long-term, retrospective compilation of an individual's movements implicates a reasonable expectation of privacy. *Id.* at 415-16 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring in the judgment). Justice Sotomayor warned that "[t]he Government can store such records and efficiently mine them for information years into the future." *Id.* at 415.

In *Carpenter v. United States*, 585 U.S. 296 (2018), the Court squarely embraced that reasoning, holding that the warrantless acquisition of seven days of historical cell-site location information was a search. *Id.* at 310-13. The Court explained that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere," *id.* at 310, and emphasized that historical location data permits the government to "travel back in time to retrace a person's whereabouts," *id.* at 311-12, providing an "intimate window into a person's life."

Three months after the District Court's order denying the second motion to suppress, the Supreme Court reaffirmed and extended *Carpenter* in *Chatrie v. United States*, 609 U.S. ___, 146 S. Ct. 2193 (2026). In *Chatrie*, the Court held that police conducted a Fourth Amendment search when they obtained two hours of Google Location History data, an even more granular form of location information than the CSLI at issue in *Carpenter*. *Chatrie*, 146 S. Ct. at 2199, 2208. The Court rejected the government's argument that accessing only a limited amount of location data falls outside the Fourth Amendment, holding that where the Fourth Amendment applies, it applies "regardless of 'the quality or quantity of information' the government obtains." *Id.* at 2210 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)).

*Chatrie* is directly contrary to the central distinction the District Court drew in this case. The District Court adopted the Magistrate Judge's conclusion that

ALPR data is *substantially less comprehensive* than CSLI and therefore does not implicate *Carpenter*. (R. Doc. 404, at p.2; R. Doc. 401, at p.16-17.) *Chatrie* forecloses that line of reasoning. The Supreme Court has now squarely held that a *less comprehensive* or *shorter duration* location dataset does not exempt the government from the Fourth Amendment if the rest of the *Carpenter* framework is satisfied. The framework is satisfied here. The FPD's ALPR network is retrospective, government-controlled, on-demand searchable across 90 days, and was used to reconstruct the red Kia's pattern of movements at a private residence. That is precisely the *Carpenter-Chatrie* concern.

*Chatrie* is supervening Supreme Court authority decided after Chief Judge Welte's order. On direct review, this Court may, and should, apply intervening Supreme Court decisions to assess whether the lower court's ruling stands. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (new constitutional rules apply retroactively to all criminal cases pending on direct review or not yet final).

**2. The Fargo ALPR system creates Carpenter-style historical movement records.**

Detective Heller's testimony establishes the depth of the FPD's ALPR program. Every patrol car (with the limited exception of school resource officers' vehicles) is fitted with an ALPR camera. (Suppression Hearing Tr., Dec. 11, 2025, p. 9-11.) ALPR data is stored in the Axon database for 90 days. (Suppression Hearing Tr., Dec. 11, 2025, p. 13, 22.) Any sworn FPD officer can query the

database without a warrant if there is a criminal nexus. (Suppression Hearing Tr., Dec. 11, 2025, p. 31-32.) FPD has now installed twenty-one fixed cameras at intersections that also feed into the system. (R. Doc. 401, at p.11 n.4.)

The ATF agent here did exactly what *Carpenter* forbids: he asked Detective Heller to reconstruct the red Kia's past whereabouts by querying the ALPR database for February 2022. The query returned at least ten hits of the red Kia at a single private residence in a single month. (Suppression Hearing Tr., Dec. 11, 2025, p. 14.) The government, without judicial process, then used those historical reads to build a pattern, identify the apartment as a target, and direct surveillance toward it. (R. Doc. 401, at p.11-13.)

The District Court's distinction (that ALPR is less comprehensive than CSLI) is overstated and depends on facts not in this record. CSLI tracks where a phone goes; ALPR tracks where a vehicle goes. Both systems aggregate retrospective location data as to which a person "does not surrender all Fourth Amendment protection." *Carpenter*, 585 U.S. at 310. The driver of a vehicle relies on the same expectation that the public catalog of his daily movements will not be reconstructed by the State without process.

The point is illustrated by analogy. Imagine that a town's mailbox locations were each manned by a human deputy who recorded the time, the date, and a photograph of every car that passed. After 90 days, those records were warehoused

and searchable. Anyone in the police force could pull, without a judge's permission, every recorded sighting of a citizen's car for the past 90 days and create a map of where that citizen lived, worshipped, doctored, and slept. That is exactly the retrospective mining of stored location records that Justice Sotomayor described in *Jones*. 565 U.S. at 415-16.

### 3. The volume and richness of the FPD network places this case beyond Knotts.

The District Court principally relied on *United States v. Knotts*, 460 U.S. 276 (1983), for the proposition that a person traveling in public has no reasonable expectation of privacy in his movements. The *Knotts* Court itself specifically reserved the question now before this Court, stating that if "dragnet-type law enforcement practices" should eventually develop, "there will be time enough then to determine whether different constitutional principles may be applicable." *Id.* at 284. The era of single-beeper, line-of-sight surveillance has ended. The FPD's network of mobile and fixed cameras, capturing thousands of plates per shift across multiple officers and 90 days, is the very dragnet *Knotts* contemplated. *Chatrie* removes any doubt. The Supreme Court there rejected the government's reliance on *Knotts*, explaining that *Knotts* was expressly cabined to the rudimentary beeper technology before it, that *Knotts* itself reserved the dragnet question, and that *Jones* and *Carpenter* each held, notwithstanding *Knotts*, that more sweeping surveillance

technologies implicate the Fourth Amendment. *Chatrie*, 146 S. Ct. at 2210-11 ("For the third time, we reach the same conclusion today.").

The Massachusetts Supreme Judicial Court reached precisely this conclusion in *Commonwealth v. McCarthy*, 484 Mass. 493, 142 N.E.3d 1090, 1104 (2020): "[W]ith enough cameras in enough locations, the historic location data from an ALPR system . . . would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes." *McCarthy* ultimately held the limited deployment in that case (four cameras on two bridges) did not constitute a search. *Id.* at 1108. The FPD network here, with cameras on every patrol car and twenty-one fixed cameras, is a scale of magnitude beyond *McCarthy*.

**4. The government's position would render the Fourth Amendment irrelevant in the age of ALPR.**

If the FPD's warrantless 90-day retention and on-demand querying of every recorded license plate in Fargo is not a search, then almost any aggregation of public-movement data, however thorough, would be permissible without a warrant. The Fourth Amendment cannot be that brittle. *Kyllo v. United States*, 533 U.S. 27, 34 (2001), cautioned against allowing technology to "shrink the realm of guaranteed privacy." This Court should hold that the warrantless acquisition and querying of historical ALPR data, on the scale present in Fargo, is a search requiring a warrant supported by probable cause.

### B. The independent source doctrine does not save the evidence

The Magistrate Judge alternatively reasoned that, even if the ALPR query were a search, the evidence would have been obtained anyway through independent means, namely the live surveillance on March 1 and March 8. (R. Doc. 401, at p.18-19.) Chief Judge Welte declined to reach the issue, having found no constitutional violation in the first place. (R. Doc. 404, at p.2 n.1.) This Court, reaching the issue *de novo*, should reject the doctrine's application here.

The independent source doctrine permits an unlawful search to thwart suppression if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact was acquired (or reacquired) by these lawful means. *United States v. Baez*, 983 F.3d 1029, 1037 (8th Cir. 2020). The Supreme Court added in *Murray v. United States*, 487 U.S. 533, 542 (1988), that the doctrine does not apply if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if any of the information obtained during the unlawful search affected their decision.

Here, Detective Heller's testimony establishes prompting in two senses. First, ATF Agent Bradt expressly directed the ALPR query, and his investigative interest in the red Kia was reinforced by the resulting ten hits pattern. (Suppression Hearing Tr., Dec. 11, 2025, p. 13-14.) Second, Detective Heller used those ALPR results to confirm that the red Kia was associated with the 3102 3rd Street North

address, which then directed the live March 8 surveillance to that location. (Suppression Hearing Tr., Dec. 11, 2025, p. 14, 16.) The ALPR query was not a separate, unrelated investigation; it was the very tool used to focus the team's attention. That the team might have discovered the same address through other means is the kind of ifs reasoning *Murray* expressly rejected. The District Court's observation that ALPR data was not a factor contributing to the traffic stop itself (R. Doc. 404, at p.2) does not answer the *Murray* question. The stop was the endpoint of a surveillance operation whose focus on the 3102 3rd Street North address had been informed by the February ALPR pattern. *Murray* asks whether unlawfully obtained information affected the investigative decisions that produced the evidence, not merely whether the officers consulted the database on the day of the stop. 487 U.S. at 542. At a minimum, because Chief Judge Welte never reached the question (R. Doc. 404, at p.2 n.1), the government cannot carry its burden of establishing a genuinely independent source on this record.

### C. The collective knowledge doctrine cannot launder the underlying constitutional violation

The District Court relied on the collective knowledge doctrine in both orders. (R. Doc. 386, at p.3-4.) As explained in Section II.A.3, supra, the doctrine could not supply the reasonable suspicion missing at the stop, and it cannot save the ALPR-derived evidence here either. The collective knowledge doctrine is a tool of attribution, not absolution. It allows reasonable suspicion held by one

officer to be imputed to another. It does not permit officers to impute lawfully obtained information when the information itself was unlawfully obtained.

The team's knowledge of the red Kia's pattern of movements was, in part, the product of warrantless ALPR data acquisition. That knowledge cannot be sanitized by being relayed from Detective Heller to Officer Novacek. As the Supreme Court observed in *Mapp v. Ohio*: "The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." 367 U.S. 643, 659 (1961).

**IV. Suppression Is the Required Remedy**

The exclusionary rule's "sole purpose" is "to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011). The Supreme Court has recognized exceptions where deterrence is not served, but those exceptions are narrow. The good faith exception does not save evidence where the officers themselves are responsible for the violation. *United States v. Leon*, 468 U.S. 897, 923 (1984). Here, the violation flows from active officer conduct: prolongation, warrantless package opening, and warrantless ALPR querying. Suppression directly deters these practices going forward and vindicates the Fourth Amendment.

The fruits of these violations include, at minimum, the fentanyl pills inside the DVD player, all observations and statements made by Mr. Lawrence after the unconstitutional prolongation, and any derivative evidence, including the contents of seized cell phones. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).

## CONCLUSION

For the foregoing reasons, Mr. Lawrence respectfully requests that this Court reverse the District Court's orders denying his motions to suppress (R. Docs. 386 & 404), vacate the conviction and sentence, and remand with instructions to grant suppression of all evidence obtained as a result of the prolonged stop, the warrantless search of the package, and the warrantless ALPR data acquisition, and to permit Mr. Lawrence to withdraw his conditional plea of guilty under Federal Rule of Criminal Procedure 11(a)(2).

Dated this 1st day of October, 2026.

Respectfully submitted,

**PRINGLE & HERIGSTAD, P.C.**

/s/*Ryan D. Sandberg*
Ryan D. Sandberg (ID #05999)
P.O. Box 1000
Minot, ND 58702-1000
Telephone: (701) 852-0381
rsandberg@pringlend.com

**ATTORNEY FOR APPELLANT**
**ADOLPH AKWE LAWRENCE**

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,235 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).
2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, in 14-point Times New Roman font for the body text and footnotes, using Microsoft Word.
3. The electronic versions of this brief and its addendum have been scanned for viruses and are virus-free, in compliance with Eighth Circuit Rule 28A(h).

/s/*Ryan D. Sandberg*
Ryan D. Sandberg (ID #05999)

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2026, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the United States Court of Appeals for the Eighth Circuit using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/*Ryan D. Sandberg*
Ryan D. Sandberg (ID #05999)