UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

**No. 26-2591**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ADOLPH AKWE LAWRENCE,
Defendant-Appellant.

On Appeal from the United States District Court
for the District of North Dakota
Case No. 3:22-cr-00069-PDW-3
The Honorable Peter D. Welte, Chief Judge

# ADDENDUM TO APPELLANT'S OPENING BRIEF

(8th Cir. R. 28A(g))


Ryan D. Sandberg (ID #05999)
PRINGLE & HERIGSTAD, P.C.
P.O. Box 1000
Minot, ND 58702-1000
Telephone: (701) 852-0381
rsandberg@pringlend.com

**ATTORNEY FOR DEFENDANT-APPELLANT**
**ADOLPH AKWE LAWRENCE**

## INDEX TO ADDENDUM


Judgment in a Criminal Case (R. Doc. 443) Add. 1

Order Adopting Report and Recommendation and Denying First Motion to Suppress (R. Doc. 386) Add. 9

Report and Recommendation on First Motion to Suppress (R. Doc. 375) Add. 15

Order Adopting Report and Recommendation and Denying Second Motion to Suppress (R. Doc. 404) Add. 45

Report and Recommendation on Second Motion to Suppress (R. Doc. 401) Add. 49

Excerpts from Suppression Hearing Transcript, February 20, 2025 (R. Doc. 364), pp. 62-68, 76, 100, 106-107, 125-126 Add. 70

Excerpts from Suppression Hearing Transcript, December 11, 2025 (R. Doc. 399), pp. 13-14 Add. 83


*Record excerpts total 15 pages. See 8th Cir. R. 28A(g)(2).*

Local AO 245B (Rev. 11/25) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of North Dakota

UNITED STATES OF AMERICA
v.
**Adolph Akwe Lawrence**

## JUDGMENT IN A CRIMINAL CASE

Case Number: **3:22-cr-69-03**

USM Number: **40239-510**

**Ryan D. Sandberg**
Defendant's Attorney

## THE DEFENDANT:

☑ pleaded guilty to count(s) **ONE (1) and TWO (2) of the Second Superseding Indictment.**

☐ pleaded nolo contendere to count(s) ____ which was accepted by the court.

☐ was found guilty on count(s) ____ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **21 USC § 846** | **Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance** | **3/7/24** | **1** |

The defendant is sentenced as provided in pages 2 through **8** of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ____

☑ Count(s) **5-8** ☐ is ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**August 5, 2026**
Date of Imposition of Judgment

[signature]
Signature of Judge

**Peter D. Welte** **U.S. Chief District Judge**
Name and Title of Judge

August 05, 2026
Date

Local AO 245B (Rev. 11/25) Judgment in a Criminal Case
Sheet 1A



DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **21 USC § 841(a)(1) and 841(b)(1)(B)(viii), 18:2** | **Possession of a Controlled Substance with Intent to Distribute** | **3/8/22** | **2** |

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

**120 MONTHS on each Count 1 and Count 2, to be served concurrently, with credit for time served.**

☑ The court makes the following recommendations to the Bureau of Prisons:
**That defendant be placed at the lowest level security facility as close as possible to the state of California, or alternatively Oregon, and that he be allowed to serve his sentence at a facility where he can participate in substance abuse treatment, including the 500 hour Residential Drug Abuse Treatment Program (RDAP). He should be allowed to participate in any educational or vocational opportunities; and any mental health treatment as deemed appropriate by the Bureau of Prisons.**

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ____________ ☐ a.m. ☐ p.m. on ____________ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on ____________ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on ____________ to ____________

at ____________ , with a certified copy of this judgment.

____________
UNITED STATES MARSHAL

By ____________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

**5 YEARS on each Count 1 and Count 2, to be served concurrently.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ____________________

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

## SPECIAL CONDITIONS OF SUPERVISION

**1. You must participate in a chemical dependency treatment program as approved by the supervising probation officer.**

**2. You must totally abstain from the use of alcohol and illegal drugs or the possession of a controlled substance, as defined in 21 U.S.C. § 802 or state statute, unless prescribed by a licensed medical practitioner; and any use of inhalants or psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair your physical or mental functioning.**

**3. You must submit to drug/alcohol screening at the direction of the United States Probation Officer to verify compliance. Failure or refusal to submit to testing can result in mandatory revocation. Tampering with the collection process or specimen may be considered the same as a positive test result.**

**4. You must participate in a program aimed at addressing specific interpersonal or social areas, for example, domestic violence, anger management, marital counseling, financial counseling, cognitive skills, parenting, at the direction of your supervising probation officer.**

**5. You must participate in mental health treatment/counseling as directed by the supervising probation officer.**

**6. As directed by the Court, if during the period of supervised release the supervising probation officer determines you are in need of placement in a Residential Re-Entry Center (RRC), you must voluntarily report to such a facility as directed by the supervising probation officer, cooperate with all rules and regulations of the facility, participate in all recommended programming, and not withdraw from the facility without prior permission of the supervising probation officer. The Court retains and exercises ultimate responsibility in this delegation of authority to the probation officer.**

**7. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)) other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.**

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until __________. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ __________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: **Adolph Akwe Lawrence**
CASE NUMBER: **3:22-cr-69-03**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ **200.00** due immediately, balance due

☐ not later than ____________ , or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

**All criminal monetary payments are to be made to the Clerk's Office, U.S. District Court, 655 1st Avenue North, Suite 130, Fargo, ND 58102.**

**While on supervised release, the Defendant shall cooperate with the Probation Officer in developing a monthly payment plan consistent with a schedule of allowable expenses provided by the Probation Office.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
**Diamond/Silver Mold of Teeth (Grill); Two Drum Magazines and one 30-round Glock Extended Magazine; Four rounds of Federal 9mm caliber ammunition; 43 rounds of assorted 9mm caliber ammunition; and Smith & Wesson 9mm magazine.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Adolph Akwe Lawrence,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER ADOPTING REPORT AND RECOMMENDATION**<br><br>Case No. 3:22-cr-69 |

Defendant Adolph Akwe Lawrence moved to exclude all evidence obtained, directly or indirectly, following a March 8, 2022 traffic stop. Doc. 323. The United States argues that Lawrence lacks standing to challenge the search during the traffic stop because Lawrence "has not shown any ownership of or privacy interest in either the car or the package," and Lawrence's suppression argument fails on the merits. Doc. 333, p. 10. Magistrate Judge Alice R. Senechal held an evidentiary hearing on February 20, 2025. Doc. 362. The parties filed pre and post-hearing briefs. Docs. 324, 333, 366, and 367. On May 15, 2025, Judge Senechal issued a Report and Recommendation. Doc. 375. The Report and Recommendation recommends that the Court deny the motion, recommending that

> the district judge conclude Lawrence has standing to challenge the search of the vehicle or, alternatively, that the district judge assume, without deciding, that Lawrence has standing to challenge the search of the vehicle. The district judge could also find Lawrence has standing to challenge the search of the package, but his standing to challenge the search of the package is not well-established, so this court RECOMMENDS the district judge assume, without deciding, that Lawrence has standing to challenge the search of the vehicle. Because Officer Novacek engaged in ordinary inquiries regarding the vehicle's registration and Lawrence's driver's license during the traffic stop, spent only a brief portion of that time investigating the name on the package, and Officer Novacek knew of Detective Heller's ongoing drug trafficking investigation, this court RECOMMENDS the district judge conclude the traffic stop was not unreasonably prolonged. Finally, this court RECOMMENDS the district judge find Officer Novacek's testimony was credible and supported his determination of probable cause to search the vehicle and the package.

Doc. 375, p. 29-30. The deadline to file objections to the Report and Recommendation was May 30. 2025. Id. at 30. The Defendant filed five objections: (1) "The Magistrate Judge Erroneously Found Officer Novacek's Testimony Credible Despite Contrary Video Evidence," (2) "The Magistrate Judge Failed to Address the Contradictions in Officer Testimony Regarding Marijuana Odor," (3) "The Magistrate Judge Improperly Applied the Collective Knowledge Doctrine," (4) 'The Magistrate Judge Mischaracterized Lawrence's Statements About Marijuana Use," and (5) "The Magistrate Judge Failed to Address Officer Novacek's Subjective Intent and Conduct." Doc. 376. The United States did not submit any objections.

The Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636. "However, the Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed." United States v. Ceron, No. 2:15-CR-55, 2019 WL 3161785, at *1 (D.N.D. July 15, 2019) (citing Thomas v. Arn, 474 U.S. 140, 150 (1985)). Here, neither party objected to the Magistrate Judge's standing determination. The Court will assume, without deciding, that Lawrence has standing to challenge the search of the vehicle and package. All five of Lawrence's objections are to the traffic stop, and the search of the vehicle and package.

First, Lawrence objects to Judge Senechal's determination that, "Comparison of video evidence shows Officer Novacek was in a better position to detect the odor of marijuana on his third approach to the vehicle than he had been on his first and second approaches to the vehicle." Doc. 376, p. 1-2 (quoting Doc. 375, p. 27-28). Lawerence states that this "directly contradicts the video evidence and testimony presented at the hearing" and undermines the credibility of Officer Novacek's claim that he smelled marijuana only on his third approach to the vehicle. Id. at 2. After reviewing both the squad car dash camera and officer body camera footage, (Doc. 334; Doc. 329),

the Court agrees with Judge Senechal's determination that Officer Novacek was in a better position to detect the odor of marijuana on his third approach to the vehicle. The dash camera footage clearly shows Officer Novacek closer to the vehicle window on the third approach than the first and second. Doc. 334. He is also not physically obstructed from the vehicle like the second approach, where Lawrence is standing between him and the vehicle.

Second, Lawrence asserts that Judge Senechal "fail[ed] to address a significant contradiction between the testimony of Officer Novacek and Officer Marvig regarding the ability to distinguish between burnt and unburnt marijuana." Doc. 376, p. 3. This "significant contradiction" is that Officer Novacek "testified he is trained to recognize the odor of marijuana, odors of burnt and raw marijuana are very similar, and the odor he detected could have been from the shake on the floorboards," (quoting Doc. 375, p. 9) and Officer Marvig testified regarding whether burnt marijuana smells differently than unburnt marijuana, "Yeah. It usually has a difference in odor" (Doc. 364, p. 128). Id. at 3. The Court does not see this as a contradiction, let alone a "significant contradiction" that undermines Officer Novacek's testimony. Two things can be true at once: burnt and unburnt marijuana can "usually" smell differently, but not extremely different, making it "hard to differentiate between the two."

Third, Lawrence claims that Judge Senechal improperly applied the collective knowledge doctrine to justify the search. Doc. 376, p. 3. "The collective knowledge doctrine imputes other officers' finding of probable cause to the arresting officer when multiple officers are involved in an investigation and as long as there is some degree of communication among the officers." Furlow v. Belmar, 52 F.4th 393, 402 (8th Cir. 2022) (quotations and citations omitted). Lawrence states that the "information shared between Detective Heller and Officer Novacek was extremely minimal," and "the Magistrate Judge overlooked critical testimony establishing that neither Adolph Lawrence nor his brother Ennis were even 'on the radar' of the investigation at the time

of the stop." Doc. 376, p. 4. Lawrence's argument that the information shared between Detective Heller and Novacek was too minimal to invoke the collective knowledge doctrine fails. "How much information must one officer convey to another in order to invoke the collective knowledge doctrine? In the Eighth Circuit, the answer is very little." United States v. Robinson, 634 F. Supp. 3d 568, 579 (W.D. Ark. 2022). "While the collective knowledge doctrine requires courts to 'distinguish between officers functioning as a 'search team' and officers acting as independent actors who merely happen to be investigating the same subject,' it does not require 'all the relevant collective knowledge of the team be communicated to the officer who made the stop.'" Id. (quoting United States v. Robinson, 664 F.3d 701, 704 (8th Cir. 2011)). Here, Detective Heller and Officer Novacek were functioning as a search team, communicating throughout the search:

> During the traffic stop, Detective Heller and Officer Novacek communicated via three phone calls and a text message. Initially, Detective Heller advised Officer Novacek of an investigation into fentanyl trafficking without identifying targets of the investigation. (Tr. 33, 62). Officer Novacek testified the second and third calls were "updates on the traffic stop in general" and the text message was a screen shot he sent to Detective Heller showing results of a query of the red Kia driver's identification information.
>
> [. . . ]
>
> Between his second and third approaches to the red Kia, Officer Novacek had relayed the name Korlu Barclay—which was on the package on the front seat of the vehicle—to Detective Heller, and Detective Heller recognized it as Ethmonia Barclay's middle name, used as her first name. Detective Heller knew Barclay's nickname was "Auntie," and Lawrence had told Officer Novacek he was staying with his aunt.

Doc. 375, p. 5, 9. Lawrence also inaccurately uses testimony from the record. In the suppression hearing, the record indicates Lawrence asks Detective Heller, "at the time when you spoke to Malik Chipps, Adolph, my client, wasn't even on your radar, was he?" and Detective Heller responds with no. Doc. 364, p. 45. This interview took place before the traffic stop. In his objections to the Report and Recommendation, Lawrence misrepresents this question as Detective Heller stating he

did not have Adolph on his radar "at the time of the stop," and not, at the interview before the traffic stop, as the question was posed to Detective Heller. Doc. 376, p. 4.

Fourth, Lawrence argues that Judge Senechal mischaracterized his statements about marijuana use in the vehicle he was in by stating that "Lawrence acknowledged others had recently smoked marijuana in the vehicle." Doc. 376, p. 4. (quoting Doc. 375, p. 28). Lawrence states that the word "acknowledged" overstates the testimony because Officer Novacek used the word "alluded," stating that "[Lawrence] alluded to somebody smoking marijuana recently within the vehicle." Id. at 5 (quoting Doc. 364, p. 80). The Court does not see this as a "significant" mischaracterization that "artificially bolsters Officer Novacek's credibility regarding the marijuana odor." Id. Both "acknowledge" and "allude" indicate an affirmative response to Officer Novacek's question about someone recently smoking marijuana in the vehicle, supporting his probable cause determination.

Finally, Lawrence argues that "the Magistrate Judge erroneously overlooked evidence that undermined Officer Novacek's credibility" by not discussing "evidence indicating Officer Novacek's true intent was to conduct a drug investigation, rather than a legitimate traffic stop, directly challeng[ing] the reliability of Officer Novacek's claim he smelled marijuana." Doc. 376, p. 5. "For a traffic stop to be constitutional under the Fourth Amendment, it must be supported by reasonable suspicion or probable cause." United States v. Hanel, 993 F.3d 540, 543 (8th Cir. 2021) (quotations and citations omitted). "Any traffic violation, however minor, provides probable cause for a traffic stop." Id. (quotations and citations omitted). Here, while Deputy Heller was certainly interested in the link between this vehicle and his drug investigation, Officer Novacek only stopped Lawrence's vehicle after he had probable cause—the expired California license tags. Doc. 375, p. 4.

Having reviewed the Report and Recommendation, the parties' filings, and the relevant legal authority, the Court agrees with Judge Senechal's thorough analysis. For the reasons outlined in the Report and Recommendation, the traffic stop was not unreasonably prolonged, and Officer Novacek's testimony was credible and supported his probable cause determination to search the vehicle and package. The Court **ADOPTS** the Report and Recommendation (Doc. 375) in its entirety. Lawrence's objections to the Report and Recommendation (Doc. 376) are **DENIED**. Finally, Lawrence's motion to suppress (Doc. 323) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 29th day of August, 2025.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:22-cr-69-3 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATIONS** |
| | ) | |
| Adolph Akwe Lawrence, | ) | |
| | ) | |
| Defendant. | ) | |

Adolph Akwe Lawrence is charged with involvement in controlled substance and money laundering conspiracies, possession of a controlled substance with intent to distribute, criminal contempt of court, obstruction of justice, and witness tampering. (Doc. 298). He moves to suppress all evidence obtained, directly or indirectly, following a March 8, 2022 traffic stop. Lawrence argues the traffic stop was unconstitutionally prolonged, there was not probable cause supporting a search of the red Kia he was driving, and there was not probable cause supporting a search of a package that was in the vehicle. (Doc. 323). The government opposes the motion and contends Lawrence lacks standing to challenge the search of the vehicle and the package that was in the vehicle, the stop was not unconstitutionally prolonged, and probable cause supported searches of both the red Kia and the package. (Doc. 333).

## Summary of Hearing Testimony and Record Evidence

The court held an evidentiary hearing on February 20, 2025. Five witnesses testified: Detective Joshua Heller, Fargo, North Dakota, Police Department (FPD);[1] FPD Officer Jonathan Novacek; FPD Officer Joshua Marvig; Mamawa Christiana Saibu

---

[1] Because of his illness, the parties agreed Detective Heller's testimony could be presented via video. (Doc. 364, pp. 9-10).

(Saibu), Lawrence's cousin; and Federal Bureau of Investigation Special Agent Caleb Williamson, the case agent. The court received various exhibits into evidence, without objections: three FPD videos depicting the traffic stop, (Doc. 329; Doc. 334) (conventionally filed), three screenshots taken from one of the videos, (Doc. 362-1; Doc. 362-2; Doc. 362-3), Saibu's North Dakota Driver's License Division Record Status, a registration card for the vehicle Lawrence was driving, and Saibu's non-driver identification card, (Doc. 362-4; Doc. 362-5; Doc. 362-6). The three FPD videos include that of Officer Novacek's body-worn camera (Video 1), that of the forward-facing camera on his squad car (Video 2), and that of the camera facing the back of the interior of his squad car (Video 3). In addition to their initial briefing, after the transcript was filed, the parties submitted post-hearing briefs. (Doc. 366; Doc. 367).

**1. Investigation Preceding the Traffic Stop**

At the time relevant to this motion, Detective Heller was assigned to the United States Marshals Service High Plains Fugitive Task Force. In that capacity, in December 2021, he arrested Malik Chipps on a probation violation warrant and found Chipps in possession of a quantity of fentanyl pills and two firearms. When interviewed by law enforcement, Chipps stated he had obtained the pills and the firearms from Bayo Adrian Saibu (Bayo)—a codefendant in this case—and identified Bayo's source as "a shorter black male with dreadlocks [who] had recently been released from a California prison." (Tr. 21).[2] Chipps also told Detective Heller the unidentified black male was known to drive a red Kia with California license plates. Using that information, Detective Heller

[2] Tr. refers to the hearing transcript filed at Docket 364.

identified the black male as Ennis Fitzgerald Lawrence (Ennis), a brother of defendant Adolph Lawrence.

Chipps told law enforcement his communications with his source of supply had been through a female who lived at 3301 16th Avenue South in Fargo, and law enforcement identified that female as Ethmonia Korlu Barclay—also a codefendant in this case. Chipps stated he had obtained the pills at Barclay's address and described her address as "kind of a gathering spot" for Ennis and Bayo. Law enforcement corroborated the information Chipps provided through review of text messages. Id. at 24.

Detective Heller testified law enforcement monitored Ennis' social media accounts after receiving the information from Chipps. Ennis' Instagram account showed a video of Ennis—in what appeared to be an apartment kitchen—holding a large amount of United States currency and showed him with "a teeth insert, almost like a mouth guard but with diamonds." Id. at 26. On the video, Ennis stated the cash was "a whole hundred," which Detective Heller testified he knew to be a reference to a hundred thousand dollars. Id. at 25.

Detective Heller, while off duty on March 1, 2022, saw Ennis and a second unidentified "black male with dreadlocks or cornrows" at Scheels All Sports, a Fargo store. Id. at 26. Detective Heller asked Scheels personnel to monitor Ennis and his companion via surveillance cameras and to advise Detective Heller when the two were about to leave the store. While Detective Heller waited in the Scheels parking lot, Scheels personnel provided Detective Heller with several screen shots of Ennis and his companion. When Ennis and his companion left the store, Detective Heller saw them enter a red Kia with California license plates. Law enforcement officers followed the red Kia to 3102 3rd Street North, a Fargo apartment building.

Through a Google search, law enforcement found photos of apartment units in that building and observed the apartment units appeared to be the same as the one in the Instagram video of Ennis holding a large amount of cash. FPD license plate readers confirmed the red Kia had been in the area of 3102 3rd Street North frequently during February 2022.

On March 8, Detective Heller and other law enforcement officers surveilled the 3102 3rd Street North area in an attempt to locate Ennis regarding a California parole violation warrant. They saw the red Kia in the building's parking lot and observed the unidentified black male who had been with Ennis at Scheels enter the red Kia and drive the vehicle to Barclay's 16th Avenue South residence. The black male entered Barclay's apartment building and left a short time later, behavior Detective Heller considered to be consistent with narcotics trafficking. Law enforcement officers followed the red Kia, and Detective Heller radioed to the FPD patrol unit, asking any patrol officer who saw the red Kia to attempt a traffic stop if there was reason to do so. Detective Heller testified the purpose of the requested traffic stop was to identify the driver of the red Kia.

## 2. March 8 Traffic Stop and Vehicle Search

Officer Novacek testified Detective Heller relayed "very, very loose information" about potential drug activity when he asked officers in the area to stop the red Kia if there was reason to do so. Id. at 62. Officer Novacek responded to the radio request, advised he had followed and located the red Kia, ran the license plate number, and learned the vehicle's California license tags had expired several days earlier. Officer Novacek stopped the vehicle on 19th Avenue North in Fargo, and Detective Heller parked in a nearby lot to watch the traffic stop. Officer Novacek's body camera, the

forward-facing camera on his squad car, and the camera facing the "cage" in the interior of his squad car were all active during the traffic stop, though audio was turned off on the body camera for a period of time during the search. (See Video 1, 34:22-37:51).

During the traffic stop, Detective Heller and Officer Novacek communicated via three phone calls and a text message. Initially, Detective Heller advised Officer Novacek of an investigation into fentanyl trafficking without identifying targets of the investigation. (Tr. 33, 62). Officer Novacek testified the second and third calls were "updates on the traffic stop in general" and the text message was a screen shot he sent to Detective Heller showing results of a query of the red Kia driver's identification information. Id. at 73.

Officer Novacek approached the red Kia twice before deciding to search the vehicle for marijuana. He testified he did not smell marijuana when he approached the vehicle the first two times. Lawrence challenges the credibility of that testimony. The United States asserts Officer Novacek's ability to detect the odor of marijuana was affected by the March 8 weather. Officer Novacek testified,

> It was very, very cold. I'm not sure exactly what the temperature was outside, below freezing, maybe in the high 20s, which doesn't sound so bad; however, the wind was a huge factor that day, blowing somewhat–somewhere in the nature of 25 to 30 miles an hour, making it very, very difficult to be outside.

Id. at 65-66. He also testified the area where he conducted the traffic stop was known to be "particularly windy" and the wind was coming from the northwest, with the front of the squad car facing due east and the rear of the squad car facing due west. Id. at 66, 105-06. He described factors that might have impacted his ability to smell marijuana during his first two approaches to the red Kia:

> Your environment is a – is a huge part of that, so with the wind being what it was, positioning of the vehicle, the passenger side approach with the driver's side window being closed, no air passing through the vehicle at that time, all of those things are a factor. Absolutely. The cold weather in and of itself personally affects me. It's harder to smell those things when it's hard to breathe through your nose.

Id. at 68.

The first time he approached the vehicle, which he testified was for "[n]o more than 15 seconds," Officer Novacek went to the passenger side, spoke to the driver through the open front passenger window, explained the reason for the traffic stop, and asked the driver—the sole occupant—for his license, registration, and insurance information. Id. Officer Novacek invited the driver to step out of the vehicle to view the expired license plate registration and because the driver did not have his license with him, Officer Novacek brought the driver to his squad car, did a pat-down to check for weapons, and placed the driver in the back seat of the squad car.

The driver identified himself as Adolph Akwe Lawrence and stated his cousin, Saibu, owned the vehicle. Officer Novacek queried the vehicle's license plate through a system that holds each state's vehicle licensing records and learned California records showed the vehicle was not registered to Saibu but was registered to Michell Robles-Guiterrez. (Video 2, 03:22-03:30). Lawrence told Officer Novacek he was staying with one of his aunts and gave both the 3301 16th Avenue South and 3102 3rd Street North addresses. (Video 3, 11:29-11:45). Although Officer Novacek initially received information showing Lawrence's driver's license was suspended, he received more accurate information from dispatch later during the stop that showed Lawrence's license was current. (Video 2, 08:40-10:33). Officer Novacek queried Lawrence's name, found a photo of Lawrence, and sent a screenshot of the photo to Detective Heller. At that point,

Officer Novacek warned Lawrence about the need to carry his driver's license and to get the vehicle registration figured out but did not issue a citation. (Tr. 76; Video 2, 12:12-13:16).

Officer Novacek testified when he first approached the vehicle, he stood "slightly behind [the passenger side pillar] and above, just enough where [he could] see inside the vehicle." (Tr. 98). He testified he did not smell marijuana when he was in that position, or when he stood "maybe a foot" from Lawrence while putting him in the squad car, or when he did the pat-down of Lawrence, or while Lawrence was in the back seat of the squad car while Officer Novacek checked Lawrence's license and registration information. Id. at 106-07; (see also Video 1, 00:05-00:18; Video 2, 01:06-01:21).

Since he had not received information confirming vehicle insurance coverage, Officer Novacek walked back to the red Kia with Lawrence, and Lawrence opened the front passenger door and handed Officer Novacek three or four pieces of paper as insurance information. Officer Novacek testified it was unusual to receive insurance information other than as a single piece of paper or a small index card. Id. at 77. During his second approach to the red Kia, Officer Novacek stood "right next to the rear right side passenger door" while Lawrence retrieved the documents. Id. at 100. Again, Officer Novacek did not smell marijuana. (See Video 1, 12:25-13:20; Video 2, 13:35-14:20).

Because wind speed made it difficult to read them, Officer Novacek took the papers Lawrence had given him to the squad car, and Lawrence returned to the red Kia. While he was in the squad car, Officer Novacek ran a query for Korlu Barclay—the name on a package in the front seat of the red Kia—but the query yielded no results. Officer Novacek testified he could not locate insurance coverage dates on the documents Lawrence had given him, he approached the vehicle for the third time, and he

immediately smelled an odor of marijuana as he reached into the vehicle to return the insurance documents to Lawrence. (Tr. 79). Officer Novacek testified reaching into the vehicle to hand the papers back to Lawrence provided a break from the wind and he could then smell the odor of marijuana. (See Video 1, 17:32-18:30; Video 2, 18:31-19:33). On cross-examination regarding his distance from the red Kia during that third approach, Officer Novacek testified he was further forward than he had been on the first approach and his body camera's lens had a "tendency to be kind of a fish-eye lens, which can distort distances." (Tr. 120); (see also Video 1, 17:32-18:30; Video 2, 18:31-19:33).

After he smelled the marijuana odor, Officer Novacek decided there was probable cause to search the red Kia for marijuana. Officer Novacek then brought Lawrence back to the squad car, took a cell phone from Lawrence, and again placed Lawrence in the back seat of the squad car. (Video 1, 18:40-19:20; Video 2, 19:45-20:20). Officer Novacek testified he smelled the odor of marijuana when he placed Lawrence in the back seat of the squad car and Lawrence told him he had no marijuana on him. (See Video 1, 18:50-19:05). Officer Novacek told Lawrence he had probable cause to search the whole vehicle, including the package in the front seat of the vehicle. (Tr. 134; Video 1, 21:37-21:49; Video 2, 22:40-22:50). Lawrence then "alluded to somebody smoking marijuana recently within the vehicle." (Tr. 80). Officer Novacek asked for backup to conduct the search, and Officer Marvig arrived on the scene and assisted with the search. (Video 1, 18:40-19:24).

Officer Novacek located "shake"—small particles of suspected marijuana—on the floorboard of the red Kia and also observed a cylindrical ashtray containing cigarillos. Officer Novacek testified it was common to remove tobacco from cigarillos and use their

flavored wrapping to smoke marijuana. (Tr. 115). Neither the shake nor the cigarillos were seized as evidence.

Officer Marvig arrived at the scene four to five minutes after Officer Novacek began the vehicle search. (Video 2, 27:05). Officer Marvig described how he assisted in the search of the red Kia, beginning at the driver's door. He testified he "noticed and articulated a strong odor of marijuana" immediately after opening the door, noticed shake on the driver's side floorboard, and saw a portable vacuum and a waste bin filled with loose-leaf tobacco. He considered the loose-leaf tobacco significant because of his knowledge that marijuana users sometimes cut open cigars and use the rolling paper to smoke marijuana. (Tr. 126-27).[3]

Officer Novacek testified he is trained to recognize the odor of marijuana, odors of burnt and raw marijuana are very similar, and the odor he detected could have been from the shake on the floorboards. Officer Marvig also testified he was trained to recognize marijuana odor.

Between his second and third approaches to the red Kia, Officer Novacek had relayed the name Korlu Barclay—which was on the package on the front seat of the vehicle—to Detective Heller, and Detective Heller recognized it as Ethmonia Barclay's middle name, used as her first name. Detective Heller knew Barclay's nickname was "Auntie," and Lawrence had told Officer Novacek he was staying with his aunt. Id. at 35-37, 72. As part of the vehicle search, Officer Novacek opened the package and found it contained an inexpensive DVD player. The package had been overnighted from

[3] The dash camera video shows three other uniformed personnel arrived after Office Marvig, but the record includes no evidence about any involvement they may have had in the traffic stop or in searches of the vehicle or package. (See Video 2, 36:27).

Sacramento, California, to Fargo, and Officer Novacek found it odd the package was sent overnight since it contained only the inexpensive DVD player. Detective Heller testified sending packages via overnight mail was significant because overnight mail is frequently used for narcotics trafficking. Id. at 36. When he took the DVD player out of its packaging, Officer Novacek saw something wrapped in foil was inside what would have been the DVD port.

After he saw something wrapped in foil in the DVD port, Officer Novacek took the package back to the squad car, again asked Lawrence about the name on the package, disassembled the DVD player, and located individual packages of what he believed to be fentanyl pills, wrapped in foil, inside the device. (Video 2, 28:50). The Second Superseding Indictment charges Lawrence "possessed approximately 3,000 pills containing a mixture and substance containing fentanyl with the intent to distribute" in Fargo on March 8. (Doc. 297, p. 3).

Officer Novacek then decided to arrest Lawrence and placed him in handcuffs. (Tr. 83). While placing the handcuffs, Officer Novacek asked Lawrence if he had been around anyone who had recently smoked marijuana, and Lawrence confirmed he had been. Officer Novacek testified Lawrence at no time denied the red Kia smelled like marijuana. While Lawrence was in the back seat of the squad car, Officer Novacek took a second cell phone from Lawrence and testified a person having two cell phones was consistent with drug trafficking activity.[4] Officer Novacek testified he read Miranda rights to Lawrence when detaining him. After completing the search of the package,

[4] The interior squad car video shows Lawrence using a cellphone while he was in the back seat of the squad car and Officer Novacek was not present, but it does not appear Lawrence verbally communicated with anyone else during that time. (See Video 3, 30:50-32:00).

Officer Novacek told Lawrence he was being arrested for possession with intent to deliver and put him in handcuffs. Officer Novacek asked Lawrence if he wanted to work with him or tell him anything, and Lawrence gave no response. (Video 2, 39:57-42:18; Video 3, 39:19-42:15). Lawrence declined Officer Novack's request that he provide a password for a cell phone. Officer Novacek transported Lawrence to the Cass County Jail in Fargo. After the squad car was parked outside the jail, Officer Novacek again asked Lawrence if he wanted to tell him anything, and Lawrence again declined to respond. (Video 2, 01:07:20-01:08:33).

### 3. Ownership of the Red Kia

When cross-examined, Detective Heller testified that, at the time of the March 8 traffic stop, he knew Saibu owned the red Kia, though on redirect-examination, he testified he had not known the name of the registered owner until Officer Novacek told him a name. (Tr. 40, 46).

Officer Novacek testified when he asked Lawrence to step out of the vehicle to look at the registration date on the license plate, Lawrence made a statement to the effect of "usually I just renew the registration at the end of the month, and then it's good to go." Id. at 118. Lawrence later told Officer Novacek his cousin owned the red Kia, but when Officer Novacek said the name of the person he found listed as the registered owner, Lawrence said his cousin had recently purchased the vehicle. (Video 2, 02:30-03:35; Video 3, 02:33-03:32).

Three screenshots from Officer Novacek's body camera are in evidence. Those exhibits show the documents Lawrence provided as proof of insurance, and they appear to identify Saibu as a "new owner" of the red Kia. (Doc. 362-1, Doc. 362-2, Doc. 362-3); (see also Tr. 91-96). Officer Novacek testified he had paid attention to insurance

information in the documents and not to information in the documents about ownership of the red Kia. (Tr. 117). Officer Novacek acknowledged there was no report suggesting the red Kia had been stolen. Id. at 109.

Lawrence presented testimony of his cousin, Saibu. Saibu testified she purchased the red Kia in California—"somewhere near Sacramento or something like that"—in 2021 or 2022, paid four to five thousand dollars for it, did not remember the name of the male from whom she purchased it and could not describe him, had insurance on the vehicle but did not remember the name of the insurance company, had no documentation showing ownership of the red Kia, and was unaware there was no record of her ever being the registered owner of the vehicle in either North Dakota or California. Id. at 153-57. Further, Saibu testified she gave Lawrence permission to use the vehicle on March 8. Id. at 137. She acknowledged she did not have a driver's license at the time of the traffic stop, though she owned a vehicle. Id. at 155.

On cross-examination, the United States questioned Saibu about her involvement in drug trafficking. She denied involvement in facilitating shipments of fentanyl to Fargo for Lawrence and his brother, Ennis, denied she lived with Ethmonia Barclay on 16th Avenue South, denied she accepted payment for drug transactions on her CashApp account, denied knowing Barclay told other people to send money to Saibu's CashApp account for drug transactions, and did not remember receiving text messages about drug transactions in February 2022. Saibu testified the package that was in the red Kia on March 8 had "nothing to do with [her]," denied knowing the package contained fentanyl pills, acknowledged she had been at Barclay's apartment on March 8 but denied knowing Lawrence had stopped at Barclay's address shortly before he was pulled over in

the red Kia, denied knowing Lawrence had told police the package in the red Kia was for her, and denied the package was for her. Id. at 147-50.

Later on March 8, Saibu was with Ennis and Barclay in a vehicle that was stopped at a Fargo gas station. Saibu denied knowing there was a large sum of cash, a gun, and a quantity of fentanyl pills in the vehicle that was stopped. Barclay's apartment was also searched on March 8, and Saibu denied knowing there had been drugs and a handgun in Barclay's apartment. Id. at 152.

After a period of cross-examination, Saibu refused to answer additional questions, asserting the prosecutor was trying to confuse her. Id. at 157. The United States then moved to strike her testimony but withdrew that motion after calling a rebuttal witness—Special Agent Williamson.

Special Agent Williamson testified about the FBI's research into Saibu's driving history and research into registration records for the red Kia. He testified queries of California and North Dakota motor vehicle records showed Saibu was not the registered owner of a vehicle in either state. Id. at 160. During a search of Barclay's apartment, law enforcement found a Non-Driver Identification Card issued to Saibu on March 1, 2022. (See Doc. 362-6). Though Special Agent Williamson identified the document as a license issued to Saibu on March 22, 2023, the document received in evidence is actually a North Dakota Driver's License Division Record Status report showing her license was suspended as of that date. (See Doc. 362-4).

Though no report of ATF Special Agent Nicholas Bradt is in the record, testimony established Special Agent Bradt authored a report stating Saibu owned the red Kia. (Tr. 89, 162-63). Special Agent Williamson confirmed a report by Special Agent Bradt identified Saibu as the owner of the red Kia but testified that appeared to be a

"typographical error." Id. at 163-64. Further, he testified an earlier report by Special Agent Bradt identified Michell Robles-Gutierrez as owner of the red Kia and Saibu as owner of a different vehicle. Id. at 164. Special Agent Williamson recognized Robles-Gutierrez's Sacramento address on a California motor vehicle record as an address associated with a codefendant charged in a case joined with this case. Id. at 165.

Additionally, Special Agent Williamson authenticated a California vehicle registration card, issued March 28, 2022, but valid from March 2, 2022, to March 2, 2023, showing Jessicah Regina Ann Eckley, of Elk Grove, California, as the registered owner of the red Kia. (Doc. 362-5). Special Agent Williamson testified Eckley was "known to be associated" with Ennis. (Tr. 166). Special Agent Williamson testified he obtained that registration card from a cooperating witness who had purchased the red Kia and also testified the cooperating witness had trafficked drugs for the codefendant charged in a case joined with this case. Id. at 168.

### 4. Ownership of the Package

While Lawrence was in the back seat of the squad car for the second time, Officer Novacek asked if he knew anything about the package on the red Kia's front seat, and Lawrence told him the package was a gift for his cousin, Saibu, though the name on the package was that of Korlu Barclay, and denied the package was for him. (Video 3, 22:17-22:32). After Officer Novacek opened the package and saw something in the DVD port, he asked Lawrence if he knew anything about the package, and Lawrence did not respond. (Tr. 83; Video 2, 29:08- 30:00; Video 3, 29:08-30:00).

During a brief period in January 2024, after the court allowed appointed counsel to withdraw and before the court appointed substitute counsel, Lawrence filed a pro se motion to suppress, which included several references to the searched package as "my

mail." (Doc. 264, p. 3). The motion was denied a few days after it was filed, since substitute counsel had then been appointed. (Doc. 266). In a footnote, the United States argues the pro se filing does not change the analysis of Lawrence's expectation of privacy but that the United States will offer the filing as evidence Lawrence knowingly possessed the fentanyl pills found in the package. (Doc. 333, p. 13 n.6).

## Law and Discussion

Under the Fourth Amendment, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The touchstone of [any] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)).

Evidence obtained as the result of an unreasonable search and seizure may be excluded from trial. Regarding suppression of evidence, the Supreme Court has held,

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a "prudential" doctrine, Pennsylvania Board of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998), created by this Court to "compel respect for the constitutional guaranty." Elkins v. United States, 364 U.S. 206, 217 (1960); see Weeks v. United States, 232 U.S. 383 (1914); Mapp v. Ohio, 367 U.S. 643 (1961). Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. Stone v. Powell, 428 U.S. 465, 486 (1976); see United States v. Janis, 428 U.S. 433, 454 n.29 (1976) (exclusionary rule "unsupportable as reparation or compensatory dispensation to the injured criminal" (internal quotation marks omitted)). The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. E.g., Herring v. United States, 555 U.S. 135, 141 and n.2 (2009); United States v. Leon, 468 U.S. 897, 909, 921 n.22 (1984); Elkins, supra, at 217 ("calculated to prevent, not to repair"). Our cases have thus limited the rule's operation to situations in which this

> purpose is "thought most efficaciously served." United States v. Calandra, 414 U.S. 338, 348 (1974). Where suppression fails to yield "appreciable deterrence," exclusion is "clearly . . . unwarranted." Janis, supra, at 454.

Davis v. United States, 564 U.S. 229, 236-37 (2011) (citations altered).

**1. Standing**

The United States asserts Lawrence does not have standing to challenge the search and seizure because he has not shown any privacy interest in the red Kia or in the package. The United States contends Lawrence presented no evidence that the vehicle's lawful owner gave him consent or permission to drive the vehicle. And the United States contends Lawrence was not the sender or intended recipient of the package and abandoned any privacy interest he might have had in the package. (Doc. 333, pp. 11-13). Lawrence counters that he had permission to drive the vehicle and therefore has standing to challenge its search and the search of the package. (Doc. 366, pp. 7-8).

An individual challenging a search or seizure bears the burden of proving, by a preponderance of evidence, that they had a legitimate expectation of privacy in the area searched. United States v. Sierra-Serrano, 11 F.4th 931, 933 (8th Cir. 2021); United States v. Bettis, 946 F.3d 1024, 1027 (8th Cir. 2020). An individual's expectation of privacy must be both subjectively and objectively reasonable—the individual must have had a subjective expectation of privacy that "society is prepared to recognize as reasonable." Smith v. Maryland, 442 U.S. 735, 740 (1979).

**A. Standing to Challenge Search of the Vehicle**

A "defendant need not be the registered owner of a vehicle to have a privacy interest in it." United States v. Awou, No. 22-CR-4051-LTS-KEM, 2024 WL 1098775, at *1 (N.D. Iowa Jan. 18, 2024) (citing United States v. Rose, 731 F.2d 1337, 1343 (8th Cir. 1984) (holding a defendant had standing to challenge a search of a vehicle owned by his

sister because she had given him permission to use the vehicle) and United States v. Bettis, 946 F.3d 1024, 1028-29 (8th Cir. 2020) (holding that when a defendant's wife rented a car and gave the defendant, who did not have a driver's license, permission to drive it, the defendant had standing to challenge a search of the rental car, despite being an unauthorized driver under the terms of the rental agreement)). Generally, a "defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). "'[A] history of regular use of' a car can establish a presumption that the defendant had permission from the owner to use the car and therefore a legitimate expectation of privacy in the car." Awou, 2024 WL 1098775, at *1 (quoting United States v. Sanchez, 943 F.2d 110, 114 (1st Cir. 1991)) (favorably cited by Muhammad, 58 F.3d at 355).

The United States argues that because "Lawrence failed to prove who lawfully owned the red Kia and that he had permission to drive the car from the owner," he lacks standing to challenge the search. (Doc. 367, p. 2). The United States' argument implies an additional requirement to establish a reasonable expectation of privacy—that the defendant must prove who actually owned the property searched. But a defendant's expectation of privacy is subjective. For example, a defendant may have permission to drive a vehicle from someone reasonably believed to own the vehicle, and the defendant's subjective expectation of privacy, which existed at the time of the search, is not necessarily negated if it later turns out that the person reasonably believed to be the owner was not the registered owner.

In United States v. Valdez Hocker, law enforcement officers received information from a confidential informant about a car involved in drug transactions, stopped the car,

searched it, and found methamphetamine in the car. 333 F.3d 1206, 1207-08 (10th Cir. 2003). The defendant, who was driving the car when law enforcement officers stopped and searched it, had borrowed the car from someone he assumed either owned the car or was in the process of purchasing it from a relative. The assumed owner had possessed the car keys, had used the vehicle for the entire week the defendant was in town, and kept the car at her home. Because the assumed owner was not the registered owner of the vehicle, the district court determined the defendant lacked standing to challenge the car's search. The Tenth Circuit disagreed, stating, "Because the focus of the inquiry is on reasonable expectations, . . . a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." Id. at 1209. Because the defendant stated he borrowed the car from someone who was determined not to be the registered owner, to establish the defendant was in lawful possession of the car, the defendant was required to "advance evidence showing that he reasonably believed that the lender was 'someone with authority to grant permission.'" Id. (quoting United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990)). The Tenth Circuit stated the defendant had submitted evidence "that would lead a reasonable person to conclude that the lender was in lawful possession"—the defendant testified he borrowed the car from someone he assumed owned the car or was in the process of purchasing it from a relative, the assumed owner had used the car as her own during the time the defendant was in town, the assumed owner had kept the car at her home, and the defendant knew the registered owner personally. Id. at 1210. The Tenth Circuit concluded "a reasonable person would assume [the lender] was in lawful possession of the subject automobile" and "had authority to lend the car," and the defendant therefore had a reasonable expectation of privacy in the car. Id. at 1210-11.

Lawrence did not testify at the suppression hearing, but certain evidence and testimony suggest Lawrence reasonably believed his cousin, Saibu, had authority to loan the red Kia to Lawrence. Testimony established that Lawrence identified Saibu as the vehicle's owner when he was stopped while driving the red Kia, Officer Novacek's body camera video shows Lawrence provided documents that identified Saibu as a "new owner" of the vehicle, and Officer Novacek testified there was no report suggesting the red Kia had been stolen. Though her credibility was questioned, Saibu testified she purchased the vehicle and gave Lawrence permission to drive it. (Tr. 137); (see also Video 1, 12:25-13:20). Additionally, testimony established Lawrence's brother, Ennis, had been seen driving the red Kia beginning in December 2021, and Lawrence was seen with Ennis in the vehicle on March 1, 2022. Given this evidence, a reasonable person could assume Saibu lawfully possessed the red Kia and had authority to lend the car to Lawrence. Under the reasoning of Valdez Hocker, the district judge could conclude Lawrence had a reasonable expectation of privacy in the red Kia and has standing to challenge its search.

Alternatively, the district judge could assume, without deciding, that Lawrence has standing to assert his Fourth Amendment claims. The Eighth Circuit has determined Fourth Amendment standing is not a jurisdictional question that must be addressed when considering a motion to suppress evidence:

> The concept of Fourth Amendment standing is a "useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." But Fourth Amendment standing "should not be confused with Article III standing." Unlike Article III standing, Fourth Amendment standing is "not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." Consistent with the scope of the Fourth Amendment's protection, a defendant may challenge an unconstitutional search only if the

> defendant had a "reasonable expectation of privacy" in the places searched or things seized.

United States v. Juneau, 73 F.4th 607, 613-14 (8th Cir. 2023) (citations omitted). If the district judge decides not to follow the reasoning of Valdez Hocker, this court recommends the district judge assume, without deciding, that Lawrence has standing to assert his Fourth Amendment claims regarding the search of the red Kia. If the district judge concludes Lawrence does not have standing to challenge the search of the vehicle, and the district judge declines to assume without deciding that he has standing to challenge the search, the district judge need not consider Lawrence's challenge to probable cause to search the vehicle.

**B. Standing to Challenge Search of the Package**

Though Lawrence could be found to have standing to challenge the search of the red Kia, that would not equate to him having standing to challenge the search of the package that was within the vehicle. That is because "possession of a seized good is not a proxy for determining whether" there was an expectation of privacy in that good. United States v. Salvucci, 448 U.S. 83, 91 (1980).

The government contends Lawrence does not have standing to challenge the search of the package because Lawrence disavowed any interest in the package and effectively abandoned the package. The government bears the burden of establishing a defendant abandoned property. United States v. James, 353 F.3d 606, 616 (8th Cir. 2003). The court considers two factors when considering whether a defendant abandoned property: (1) whether the defendant denied ownership of the item and (2) whether the defendant physically relinquished the item. Id. Here, the package did not identify Lawrence as the sender or recipient. Lawrence told Officer Novacek the

package was for his cousin and not for him. Though the package was in the vehicle Lawrence was driving, he told Officer Novacek he had borrowed that vehicle from his cousin. Notwithstanding Lawrence's pro se motion referring to the package as "my mail," Lawrence has not asserted a legitimate expectation of privacy in the package, and even if he had some interest, the government has shown Lawrence abandoned that interest when he disavowed ownership of the package. Based on these facts, the district judge could conclude Lawrence does not have standing to challenge the search of the package and therefore need not address whether there was probable cause to search the package.

Alternatively, the district judge could conclude Lawrence's pro se motion to suppress, in which he claimed ownership of the package, along with the package having been in his possession when he was stopped in the red Kia and having been addressed to Lawrence's aunt, with whom Lawrence said he was residing, is sufficient to establish standing to challenge its search. The fact that other names were on the package does not necessarily preclude a finding of standing to challenge the search. Many courts have held an individual's use of an alias or fictitious name in sending or receiving mail does not, standing alone, deprive that individual of standing to challenge an alleged illegal search or seizure of mail. United States v. Pitts, 322 F.3d 449, 459 (7th Cir. 2003); United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992); United States v. Yodprasit, No. CR19-4088-LTS, 2020 WL 1076044, at *7 (N.D. Iowa Mar. 6, 2020); North Dakota v. Gardner, 927 N.W.2d 84, 91 (N.D. 2019).

But other courts have held there is no expectation of privacy if the sender or receiver's identity is concealed when a package is mailed. United States v. Gonzalez, Nos. CR.A. 02-446-01 to -03, 2003 WL 431636, at *1 (E.D. Pa. Feb. 20, 2003); United

States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990). One court observed that "many of the federal courts of appeals have been reluctant to find that a defendant holds a reasonable expectation of privacy in mail where he is listed as neither the sender nor the recipient, at least absent some showing by the defendant of a connection." United States v. Stokes, 829 F.3d 47, 52 (1st Cir. 2016); see also Gardner, 927 N.W.2d at 91 (recognizing courts "have rejected a claimed search or seizure violation by a person who was not the sender or receiver of a package" but emphasizing "the person claiming a violation failed either to claim or substantiate ownership of either the package or its contents") (collecting cases).

Certainly, the question of whether Lawrence has standing to challenge the search of the package is complicated not only by his pro se motion to suppress in which he claimed ownership of the package but also by conflicting case law on whether one who is listed as neither sender nor recipient has standing to challenge a package seizure and search. Those issues aside, as discussed above, a court may assume, without deciding, that a defendant has standing to challenge a search and seizure. Under the circumstances here, this court recommends the district judge assume, without deciding, that Lawrence has standing to assert his Fourth Amendment claims concerning the package.

This court will therefore consider whether probable cause supported search of the red Kia or of the package.

**2. Length of Traffic Stop**

Lawrence argues Officer Novacek's investigation of the name on the package was unrelated to the reason for the traffic stop and unreasonably prolonged the traffic stop. The United States asserts the mission of the traffic stop included investigation of drug

trafficking and asserts the collective knowledge doctrine provided grounds for Officer Novacek to pursue the drug investigation mission from the moment he spotted the red Kia until the search began. (Doc. 333, p. 14). Lawrence argues Detective Heller did not provide Officer Novacek enough information about the drug trafficking investigation to give Officer Novacek probable cause to search the vehicle. (Doc. 366, p. 6). In Lawrence's view, "Collective knowledge was not used because, at the time, the unidentified driver and vehicle amounted only to a mere hunch." Id. at 7. Though Officer Novacek had limited information about the drug trafficking investigation, that limited information is sufficient to give rise to application of the collective knowledge doctrine. See United States v. Thompson, 533 F.3d 964, 969 (8th Cir. 2008) (stating "collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers").

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Rodriguez v. United States, 575 U.S. 348, 350 (2015). "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." United States v. Rederick, 65 F.4th 961, 966 (8th Cir. 2023) (quoting United States v. Magallon, 984 F.3d 1263, 1278 (8th Cir. 2021)). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Rodriguez, 575 U.S. at 355 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). "Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id.

Officer Novacek testified he understood the purpose of a traffic stop would be to help further Detective Heller's investigation by identifying the driver of the red Kia. He also testified Detective Heller asked him to find "a reason, my own reason, to make the traffic stop," which Officer Novacek testified is common in narcotics investigations. (Tr. 61). Once Officer Novacek located the vehicle, he queried the license plate number through a nationwide database, which showed the vehicle's registration was expired.

When Officer Novacek first approached the red Kia, he explained his reason for the stop as the expired registration and asked Lawrence, who was not yet identified, for his license, registration, and insurance. Id. at 65; (see also Video 1, 00:00-00:50). Because Lawrence stated he did not have his license with him, Officer Novacek invited Lawrence to the squad car so Officer Novacek could search Lawrence's license and the vehicle's registration. (Video 1, 00:50-00:53). Questioning Lawrence about his license information and the vehicle's registration information took several minutes, in part because Officer Novacek received conflicting information regarding Lawrence's licensure status. (See Video 1, 01:33-12:12).

Because Officer Novacek had not yet received Lawrence's insurance documents, they both returned to the vehicle so Lawrence could retrieve the insurance information. (Video 1, 12:21-13:19). Officer Novacek testified because Lawrence provided multiple pages in response to the request for insurance information and because it was very windy, he took the documents back to his squad car. While in the squad car reviewing the insurance documents Lawrence had given him, Officer Novacek queried the recipient's name on the package—Korlu Barclay. (Tr. 77-79; Video 1, 13:29-17:18). During the approximately four minutes Officer Novacek was in his squad car with the insurance coverage documents, the audio from his body-worn camera includes sounds

of typing, sounds of papers moving, and a brief verbal communication—apparently to Detective Heller—during which Officer Novacek stated he did not find the name Korlu Barclay when he searched for it. It is not possible to precisely determine how much of the four minutes was spent on a query of the name on the package and how much of that time was spent reviewing the insurance documents Lawrence had given him. But to the extent query of the name prolonged the traffic stop, the prolongation was brief. And because Officer Novacek was aware of the drug trafficking investigation, any prolongation of the stop to investigate the name on the package was warranted.

When he approached the vehicle to return the insurance documents to Lawrence, Officer Novacek detected the odor of marijuana in the vehicle and concluded there was probable cause to search the vehicle. (Video 1, 17:30-18:30). Until Officer Novacek approached the vehicle the third time, his investigation primarily focused on inquiries incident to the vehicle's expired registration. Though the first eighteen minutes of the traffic stop included a brief inquiry about the recipient's name on the package, during those first eighteen minutes, Officer Novacek focused on routine traffic stop procedures—checking Lawrence's driver's license status, the vehicle's registration, and proof of insurance. (Video 1, 00:00-18:30). The district judge should conclude the traffic stop was not unreasonably prolonged.

## 3. Probable Cause

### A. Search of the Vehicle

"Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." United States v. Shackleford, 830 F.3d 751, 753 (8th Cir. 2016). "Under what is termed the 'automobile exception'. . . , an officer who has lawfully

stopped a vehicle can search the vehicle without a warrant if the officer has probable cause." United States v. Beard, 708 F.3d 1062, 1065 (8th Cir. 2013) (quoting United States v. Mayo, 627 F.3d 709, 713-14 (8th Cir. 2010)). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (quoting Mayo, 627 F.3d at 713-714). The Eighth Circuit has repeatedly held the odor of marijuana in a vehicle can provide probable cause to search a vehicle under the automobile exception. United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020); United States v. Parks, 902 F.3d 805, 813 (8th Cir. 2018); Beard, 708 F.3d at 1065; United States v. Barry, 394 F.3d 1070, 1078 (8th Cir. 2005); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000); United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999).

Lawrence challenges the credibility of Officer Novacek's testimony about the odor of marijuana and the subsequent determination of probable cause to search the vehicle. The Eight Circuit has held,

> Credibility assessments are "the province of the trial court." As such, the "decision to credit a witness's testimony over that of another can almost never be a clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it."

United States v. Harper, 787 F.3d 910, 914 (8th Cir. 2015) (citations omitted).

Officer Novacek testified he received training specific to detecting the odor of marijuana, he was familiar with the odor of marijuana, and he frequently encountered marijuana while he worked as a patrol officer. Officer Novacek currently works in training new officers, including training in detecting and identifying the odor of marijuana. (Tr. 59-60). Lawrence questions Officer Novacek's testimony that the odors

of burnt and unburnt marijuana are similar, asserting that testimony supports his position that Officer Novacek "never smelled the odor of any type of marijuana coming from inside the vehicle." (Doc. 366, p. 6).

Before beginning the search of the vehicle, Officer Novacek requested assistance of another patrol officer, and Officer Marvig responded. Officer Marvig testified when he arrived at the traffic stop, he opened the driver's door to assist with the search and immediately "noticed and articulated a strong odor of marijuana." (Tr. 125-26). Officer Marvig testified he received training on identifying the odor of marijuana and, during his time as a patrol officer, became familiar with the appearance and the odor of marijuana. Id. at 123-124.

The fact that Officer Novacek did not smell marijuana until his third approach to the vehicle more than eighteen minutes into the traffic stop does not defeat his credibility or negate existence of probable cause to search the vehicle. See United States v. Qualls, No. 23-cr-2021, 2023 WL 5992788, at *6 (N.D. Iowa Aug. 7, 2023), report and recommendation adopted, 2023 WL 5584097, at *4 (N.D. Iowa Aug. 29, 2023) (finding probable cause is not defeated just because the police officer did not smell marijuana when he first approached the defendant's vehicle). Officer Novacek testified that factors such as wind, cold temperature, and his position in relation to the red Kia likely affected his ability to detect the odor of marijuana during his first two approaches to the vehicle, and courts have recognized those conditions as impacting an officer's ability to detect the odor of marijuana. See, e.g., Qualls, 2023 WL 5992788 (noting a police officer's testimony that wind direction, wind speed, weather conditions, the number of windows open in the vehicle, and which side of the vehicle an officer approaches may affect an officer's ability to smell marijuana). Comparison of video evidence shows Officer

Novacek was in a better position to detect the odor of marijuana on his third approach to the vehicle than he had been on his first and second approaches to the vehicle. (See Video 2, 01:08-01:20, 13:36-14:20, 18:32-19:34).

Officer Novacek's testimony about smelling marijuana was corroborated by Officer Marvig's testimony. Lawrence acknowledged others had recently smoked marijuana in the vehicle. Lawrence provided no extrinsic evidence to contradict the credibility of Officer Novacek's testimony and points to no internal inconsistencies in that testimony. Under these circumstances, Officer Novacek's testimony that he smelled the odor of marijuana is "not so implausible that a reasonable fact-finder would not credit the testimony." See United States v. Portmann, 207 F.3d 1032, 1033 (8th Cir. 2000) (per curiam). This court finds no reason to determine Officer Novacek's testimony was not credible or reason to question his determination of probable cause to search the red Kia. The district judge should therefore conclude probable cause existed to search the vehicle.

**B. Probable Cause to Search the Package**

"The automobile exception permits warrantless searches of an automobile and seizures of contraband where there is 'probable cause to believe that an automobile contains contraband.'" United States v. Farrington, 42 F.4th 895, 899 (8th Cir. 2022) (quoting United States v. Evans, 830 F.3d 761, 767 (8th Cir. 2016)). "Such searches may lawfully reach 'places in which there is probable cause to believe that [contraband] may be found,' including containers discovered within the automobile." Id. (quoting California v. Acevedo, 500 U.S. 565, 579-80 (1991)). The Eighth Circuit has repeatedly held the smell of marijuana along with credible testimony of an officer trained in

detection of the odor of marijuana is sufficient to establish probable cause to search a vehicle and its contents. United States v. Smith, 789 F.3d 923, 929 (8th Cir. 2015).

As discussed above, in this court's opinion, Officer Novacek's testimony regarding the odor of marijuana was credible. Officer Novacek's detection of the odor of marijuana provided probable cause to search the vehicle and any containers within the vehicle that could have contained marijuana. Because a package the size of a DVD player could have contained marijuana, Officer Novacek had probable cause to search the package. The district judge should therefore conclude probable cause existed to search the package.

**Recommendation**

Because a reasonable person could assume Lawrence's cousin lawfully possessed the vehicle and had authority to lend the vehicle to Lawrence, this court **RECOMMENDS** the district judge conclude Lawrence has standing to challenge the search of the vehicle or, alternatively, that the district judge assume, without deciding, that Lawrence has standing to challenge the search of the vehicle. The district judge could also find Lawrence has standing to challenge the search of the package, but his standing to challenge the search of the package is not well-established, so this court **RECOMMENDS** the district judge assume, without deciding, that Lawrence has standing to challenge the search of the vehicle.

Because Officer Novacek engaged in ordinary inquiries regarding the vehicle's registration and Lawrence's driver's license during the traffic stop, spent only a brief portion of that time investigating the name on the package, and Officer Novacek knew of Detective Heller's ongoing drug trafficking investigation, this court **RECOMMENDS** the district judge conclude the traffic stop was not unreasonably prolonged. Finally, this court **RECOMMENDS** the district judge find Officer Novacek's testimony was credible

and supported his determination of probable cause to search the vehicle and the package.

Dated this 15th day of May, 2025.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

**NOTICE OF RIGHT TO OBJECT**[5]

Any party may object to this Report and Recommendations by filing with the Clerk of Court no later than **May 30, 2025**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

[5] See Fed. R. Crim. P. 59; D.N.D. Crim. L.R. 59.1(D)(3)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 3:22-cr-69 |
| Adolph Akwe Lawrence, | ) | |
| | ) | |
| Defendant. | ) | |

---

Defendant Adolph Akwe Lawrence moves to suppress evidence following a March 8, 2022, traffic stop and to dismiss count seven of the second superseding indictment. Docs. 381; 378. United States Magistrate Judge Alice R. Senechal held an evidentiary hearing on the suppression motion. Doc. 387. She filed a Report and Recommendation where she recommends denying the suppression motion. Doc. 401. Lawrence filed an objection. Doc. 402. After reviewing both motions, the objection, and the Report and Recommendation, the Court adopts the Report and Recommendation and denies both motions.

## I. Suppression Motion

Lawrence contends that law enforcement's use of automatic license plate reader ("ALPR") data violated his Fourth Amendment rights. Doc. 381. The United States argues use of ALPR data does not constitute a search within the meaning of the Fourth Amendment. Doc. 390, p. 4-5. On December 11, 2025, Judge Senechal held an evidentiary hearing on the suppression motion. Doc. 397. She later filed a Report and Recommendation, stating:

> Lawrence cites no case law adopting the position he posits. Nor has this court's research identified cases doing so. Lawrence has not advanced arguments sufficient to lead the court to conclude use of ALPR data should be considered a Fourth Amendment search. Even if the conclusion were theoretically viable, the evidence shows ALPR data was not a factor contributing to the traffic stop and the package search that followed. This court recommends the district judge conclude the use of

> ALPR data was not a search under the Fourth Amendment and did not violate Lawrence's constitutional rights.

Doc. 401, p. 17-18. The deadline to file objections to the Report and Recommendation was January 29, 2026. Lawrence filed a timely objection. Doc. 402.

The Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636. "However, the Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed." United States v. Ceron, No. 2:15-CR-55, 2019 WL 3161785, at *1 (D.N.D. July 15, 2019) (citing Thomas v. Arn, 474 U.S. 140, 150 (1985)).

Lawrence objects to Judge Senechal's conclusion that use of ALPR data is not a search under the Fourth Amendment.[1] Doc. 402 at 1. Specifically, Lawrence argues Judge Senechal incorrectly distinguished his case from Carpenter v. United States. Id. at 2; 585 U.S. 296 (2018). He asserts use of ALPR data is akin to Carpenter's "detailed chronicle" of movements created from historical cell-cite location data. Id. After reviewing the case law, this Court agrees with Judge Senechal's determination that law enforcement's use of ALPR data is not a search under the Fourth Amendment. Further, this Court finds Lawrence's case is distinguishable from Carpenter. As other courts have concluded, ALPR data is substantially less comprehensive compared to Carpenter's cell-cite location information. United States v. Jiles, 2024 WL 891956, at *19 (D. Neb. Feb. 29, 2024). Lawrence has not provided any case law to the contrary. What is more, the evidence shows that ALPR data was not a factor contributing to Lawrence's traffic stop. Doc. 399, p. 16.

[1] Lawrence also objects to Judge Senechal's application of the independent source doctrine. Doc. 402, p. 2. Because the Court concludes that use of ALPR data does not constitute an unlawful search under the Fourth Amendment, it does not discuss Lawrence's independent source argument.

## II. Motion to Dismiss

Lawrence argues count seven of the second superseding indictment (witness tampering under 18 U.S.C. § 1512(c)(2)) is multiplicious with count six (obstruction of justice under 18 U.S.C. § 1503(a)) and should be dismissed. Doc. 378.

Under Federal Rule of Criminal Procedure 12(b), a criminal defendant may move to dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). Indeed, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12. An indictment is multiplicious when it charges a single offense in several counts. United States v. Wilkinson, 124 F.3d 971, 975 (8th Cir. 1997). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932). The Blockburger test is met "notwithstanding a substantial overlap in the proof offered to establish the crimes." Wilkinson, 124 F.3d at 975.

The United States argues "[p]recedent from the Eighth Circuit and every other federal appellate court to consider the question holds that simultaneous prosecutions for obstruction of justice under 18 U.S.C. § 1503 and witness tampering under 18 USC § 1512 are not multiplicitous." Doc. 384, p. 1. The Court agrees and is bound by such precedent. Count seven is not multiplicious with count six as each crime requires proof of an element different than the other. United States v. Risken, 788 F.2d 1361, 1369 (8th Cir. 1986). All circuit courts to consider the question have concluded the same. United States v. Davis, 854 F.3d 1276, 1289-90 (11th Cir. 2017); United States v. LeMoure, 474 F.3d 37, 43 (1st Cir. 2007); United States v. Wesley, 748 F.2d 962, 963-65 (5th Cir. 1984). As such, Lawrence's argument fails.

Having reviewed the Report and Recommendation, the parties' filings, and the relevant legal authority, the Court agrees with Judge Senechal's thorough analysis. For the reasons outlined in the Report and Recommendation, Lawrence has not convinced the Court that use of ALPR data constitutes a search under the Fourth Amendment. The Court **ADOPTS** the Report and Recommendation (Doc. 401) in its entirety. Lawrence's objections to the Report and Recommendation (Doc. 402) are **DENIED**. Lawrence's motion to suppress (Doc. 381) is **DENIED**. Finally, Lawrence's motion to dismiss (Doc. 378) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 18th day of March, 2026.

*<u>/s/ Peter D. Welte</u>*
Peter D. Welte, Chief Judge
United States District Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Adolph Akwe Lawrence,<br><br>Defendant. | Case No. 3:22-cr-69<br><br>**REPORT AND RECOMMENDATION** |

Adolph Akwe Lawrence is charged with involvement in controlled substance and money laundering conspiracies, possession of a controlled substance with intent to distribute, criminal contempt of court, obstruction of justice, and witness tampering. (Doc. 298). In a second motion to suppress, Lawrence contends warrantless acquisition and use of evidence obtained from Automated License Plate Readers (ALPRs) led to a vehicle search that violated his rights under the Fourth Amendment of the United States Constitution. (Doc. 381). He argues collection and retention of ALPR data violated his reasonable expectation of privacy and constituted an impermissible dragnet surveillance program. Further, he asserts the collective knowledge doctrine cannot cure the constitutional violations. (Doc. 382).

The evidence Lawrence seeks to suppress is a large quantity of fentanyl pills found in a package in the vehicle Lawrence was driving when he was stopped for a driving offense. The United States argues Lawrence lacks standing to challenge the package search, use of ALPR data is not a search within meaning of the Fourth Amendment, and regardless of the constitutionality of use of ALPR data, search of the package did not offend the Fourth Amendment. (Doc. 390).

The court held an evidentiary hearing on Lawrence's second motion to suppress on December 11, 2025, at which Fargo, North Dakota, Police Department Detective Joshua Heller was the sole witness. No additional exhibits were submitted during the December 11 hearing. At the conclusion of the hearing, the court gave the parties an opportunity to submit post-hearing briefs after a hearing transcript was filed, but the parties later advised the court they agreed submission of post-hearing briefs was not necessary.

## Evidence Presented at First Hearing

Following an evidentiary hearing on Lawrence's first motion to suppress, this court filed a Report and Recommendation summarizing the hearing testimony and record evidence:

### 1. Investigation Preceding the Traffic Stop

> At the time relevant to this motion, Detective Joshua Heller was assigned to the United States Marshals Service High Plains Fugitive Task Force. In that capacity, in December 2021, he arrested Malik Chipps on a probation violation warrant and found Chipps in possession of a quantity of fentanyl pills and two firearms. When interviewed by law enforcement, Chipps stated he had obtained the pills and the firearms from Bayo Adrian Saibu (Bayo)—a codefendant in this case—and identified Bayo's source as "a shorter black male with dreadlocks [who] had recently been released from a California prison." (Tr. 21).[1] Chipps also told Detective Heller the unidentified black male was known to drive a red Kia with California license plates. Using that information, Detective Heller identified the black male as Ennis Fitzgerald Lawrence (Ennis), a brother of defendant Adolph Lawrence.
>
> Chipps told law enforcement his communications with his source of supply had been through a female who lived at 3301 16th Avenue South in Fargo, and law enforcement identified that female as Ethmonia Korlu Barclay—also a codefendant in this case. Chipps stated he had obtained the pills at Barclay's address and described her address as "kind of a gathering spot" for Ennis and Bayo. Law enforcement corroborated the information Chipps provided through review of text messages. Id. at 24.

[1] Tr. refers to the hearing transcript filed at Docket 364.

Detective Heller testified law enforcement monitored Ennis' social media accounts after receiving the information from Chipps. Ennis' Instagram account showed a video of Ennis—in what appeared to be an apartment kitchen—holding a large amount of United States currency and showed him with "a teeth insert, almost like a mouth guard but with diamonds." Id. at 26. On the video, Ennis stated the cash was "a whole hundred," which Detective Heller testified he knew to be a reference to a hundred thousand dollars. Id. at 25.

Detective Heller, while off duty on March 1, 2022, saw Ennis and a second unidentified "black male with dreadlocks or cornrows" at Scheels All Sports, a Fargo store. Id. at 26. Detective Heller asked Scheels personnel to monitor Ennis and his companion via surveillance cameras and to advise Detective Heller when the two were about to leave the store. While Detective Heller waited in the Scheels parking lot, Scheels personnel provided Detective Heller with several screen shots of Ennis and his companion. When Ennis and his companion left the store, Detective Heller saw them enter a red Kia with California license plates. Law enforcement officers followed the red Kia to 3102 3rd Street North, a Fargo apartment building.

Through a Google search, law enforcement found photos of apartment units in that building and observed the apartment units appeared to be the same as the one in the Instagram video of Ennis holding a large amount of cash. [Fargo Police Department (FPD)] license plate readers confirmed the red Kia had been in the area of 3102 3rd Street North frequently during February 2022.

On March 8, [2022], Detective Heller and other law enforcement officers surveilled the 3102 3rd Street North area in an attempt to locate Ennis regarding a California parole violation warrant. They saw the red Kia in the building's parking lot and observed the unidentified black male who had been with Ennis at Scheels enter the red Kia and drive the vehicle to Barclay's 16th Avenue South residence. The black male entered Barclay's apartment building and left a short time later, behavior Detective Heller considered to be consistent with narcotics trafficking. Law enforcement officers followed the red Kia, and Detective Heller radioed to the FPD patrol unit, asking any patrol officer who saw the red Kia to attempt a traffic stop if there was reason to do so. Detective Heller testified the purpose of the requested traffic stop was to identify the driver of the red Kia.

## 2. March 8 Traffic Stop and Vehicle Search

[FPD] Officer [Jonathan] Novacek testified Detective Heller relayed "very, very loose information" about potential drug activity when he asked officers in the area to stop the red Kia if there was reason to do so. Id. at 62. Officer Novacek responded to the radio request, advised he had followed

and located the red Kia, ran the license plate number, and learned the vehicle's California license tags had expired several days earlier. Officer Novacek stopped the vehicle on 19th Avenue North in Fargo, and Detective Heller parked in a nearby lot to watch the traffic stop. Officer Novacek's body camera, the forward-facing camera on his squad car, and the camera facing the "cage" in the interior of his squad car were all active during the traffic stop, though audio was turned off on the body camera for a period of time during the search. (See Video 1, 34:22-37:51).

During the traffic stop, Detective Heller and Officer Novacek communicated via three phone calls and a text message. Initially, Detective Heller advised Officer Novacek of an investigation into fentanyl trafficking without identifying targets of the investigation. (Tr. 33, 62). Officer Novacek testified the second and third calls were "updates on the traffic stop in general" and the text message was a screen shot he sent to Detective Heller showing results of a query of the red Kia driver's identification information. Id. at 73.

Officer Novacek approached the red Kia twice before deciding to search the vehicle for marijuana. He testified he did not smell marijuana when he approached the vehicle the first two times. Lawrence challenges the credibility of that testimony. The United States asserts Officer Novacek's ability to detect the odor of marijuana was affected by the March 8 weather. Officer Novacek testified,

> It was very, very cold. I'm not sure exactly what the temperature was outside, below freezing, maybe in the high 20s, which doesn't sound so bad; however, the wind was a huge factor that day, blowing somewhat– somewhere in the nature of 25 to 30 miles an hour, making it very, very difficult to be outside.

Id. at 65-66. He also testified the area where he conducted the traffic stop was known to be "particularly windy" and the wind was coming from the northwest, with the front of the squad car facing due east and the rear of the squad car facing due west. Id. at 66, 105-06. He described factors that might have impacted his ability to smell marijuana during his first two approaches to the red Kia:

> Your environment is a – is a huge part of that, so with the wind being what it was, positioning of the vehicle, the passenger side approach with the driver's side window being closed, no air passing through the vehicle at that time, all of those things are a factor. Absolutely. The cold weather in and of itself personally affects me. It's harder to smell those things when it's hard to breathe through your nose.

Id. at 68.

The first time he approached the vehicle, which he testified was for "[n]o more than 15 seconds," Officer Novacek went to the passenger side, spoke to the driver through the open front passenger window, explained the reason for the traffic stop, and asked the driver—the sole occupant—for his license, registration, and insurance information. Id. Officer Novacek invited the driver to step out of the vehicle to view the expired license plate registration and because the driver did not have his license with him, Officer Novacek brought the driver to his squad car, did a pat-down to check for weapons, and placed the driver in the back seat of the squad car.

The driver identified himself as Adolph Akwe Lawrence and stated his cousin, Saibu, owned the vehicle. Officer Novacek queried the vehicle's license plate through a system that holds each state's vehicle licensing records and learned California records showed the vehicle was not registered to Saibu but was registered to Michell Robles-Guiterrez. (Video 2, 03:22-03:30). Lawrence told Officer Novacek he was staying with one of his aunts and gave both the 3301 16th Avenue South and 3102 3rd Street North addresses. (Video 3, 11:29-11:45). Although Officer Novacek initially received information showing Lawrence's driver's license was suspended, he received more accurate information from dispatch later during the stop that showed Lawrence's license was current. (Video 2, 08:40-10:33). Officer Novacek queried Lawrence's name, found a photo of Lawrence, and sent a screenshot of the photo to Detective Heller. At that point, Officer Novacek warned Lawrence about the need to carry his driver's license and to get the vehicle registration figured out but did not issue a citation. (Tr. 76; Video 2, 12:12-13:16).

Officer Novacek testified when he first approached the vehicle, he stood "slightly behind [the passenger side pillar] and above, just enough where [he could] see inside the vehicle." (Tr. 98). He testified he did not smell marijuana when he was in that position, or when he stood "maybe a foot" from Lawrence while putting him in the squad car, or when he did the pat-down of Lawrence, or while Lawrence was in the back seat of the squad car while Officer Novacek checked Lawrence's license and registration information. Id. at 106-07; (see also Video 1, 00:05-00:18; Video 2, 01:06-01:21).

Since he had not received information confirming vehicle insurance coverage, Officer Novacek walked back to the red Kia with Lawrence, and Lawrence opened the front passenger door and handed Officer Novacek three or four pieces of paper as insurance information. Officer Novacek testified it was unusual to receive insurance information other than as a single piece of paper or a small index card. Id. at 77. During his second approach to the red Kia, Officer Novacek stood "right next to the rear right side passenger door" while Lawrence retrieved the documents. Id. at 100.

Again, Officer Novacek did not smell marijuana. (See Video 1, 12:25-13:20; Video 2, 13:35-14:20).

Because wind speed made it difficult to read them, Officer Novacek took the papers Lawrence had given him to the squad car, and Lawrence returned to the red Kia. While he was in the squad car, Officer Novacek ran a query for Korlu Barclay—the name on a package in the front seat of the red Kia—but the query yielded no results. Officer Novacek testified he could not locate insurance coverage dates on the documents Lawrence had given him, he approached the vehicle for the third time, and he immediately smelled an odor of marijuana as he reached into the vehicle to return the insurance documents to Lawrence. (Tr. 79). Officer Novacek testified reaching into the vehicle to hand the papers back to Lawrence provided a break from the wind and he could then smell the odor of marijuana. (See Video 1, 17:32-18:30; Video 2, 18:31-19:33). On cross-examination regarding his distance from the red Kia during that third approach, Officer Novacek testified he was further forward than he had been on the first approach and his body camera's lens had a "tendency to be kind of a fish-eye lens, which can distort distances." (Tr. 120); (see also Video 1, 17:32-18:30; Video 2, 18:31-19:33).

After he smelled the marijuana odor, Officer Novacek decided there was probable cause to search the red Kia for marijuana. Officer Novacek then brought Lawrence back to the squad car, took a cell phone from Lawrence, and again placed Lawrence in the back seat of the squad car. (Video 1, 18:40-19:20; Video 2, 19:45-20:20). Officer Novacek testified he smelled the odor of marijuana when he placed Lawrence in the back seat of the squad car and Lawrence told him he had no marijuana on him. (See Video 1, 18:50-19:05). Officer Novacek told Lawrence he had probable cause to search the whole vehicle, including the package in the front seat of the vehicle. (Tr. 134; Video 1, 21:37-21:49; Video 2, 22:40-22:50). Lawrence then "alluded to somebody smoking marijuana recently within the vehicle." (Tr. 80). Officer Novacek asked for backup to conduct the search, and [Fargo Police Department] Officer [Joshua] Marvig arrived on the scene and assisted with the search. (Video 1, 18:40-19:24).

Officer Novacek located "shake"—small particles of suspected marijuana—on the floorboard of the red Kia and also observed a cylindrical ashtray containing cigarillos. Officer Novacek testified it was common to remove tobacco from cigarillos and use their flavored wrapping to smoke marijuana. (Tr. 115). Neither the shake nor the cigarillos were seized as evidence.

Officer Marvig arrived at the scene four to five minutes after Officer Novacek began the vehicle search. (Video 2, 27:05). Officer Marvig described how he assisted in the search of the red Kia, beginning at the driver's door. He testified he "noticed and articulated a strong odor of

marijuana" immediately after opening the door, noticed shake on the driver's side floorboard, and saw a portable vacuum and a waste bin filled with loose-leaf tobacco. He considered the loose-leaf tobacco significant because of his knowledge that marijuana users sometimes cut open cigars and use the rolling paper to smoke marijuana. (Tr. 126-27).[2]

Officer Novacek testified he is trained to recognize the odor of marijuana, odors of burnt and raw marijuana are very similar, and the odor he detected could have been from the shake on the floorboards. Officer Marvig also testified he was trained to recognize marijuana odor.

Between his second and third approaches to the red Kia, Officer Novacek had relayed the name Korlu Barclay—which was on the package on the front seat of the vehicle—to Detective Heller, and Detective Heller recognized it as Ethmonia Barclay's middle name, used as her first name. Detective Heller knew Barclay's nickname was "Auntie," and Lawrence had told Officer Novacek he was staying with his aunt. Id. at 35-37, 72. As part of the vehicle search, Officer Novacek opened the package and found it contained an inexpensive DVD player. The package had been overnighted from Sacramento, California, to Fargo, and Officer Novacek found it odd the package was sent overnight since it contained only the inexpensive DVD player. Detective Heller testified sending packages via overnight mail was significant because overnight mail is frequently used for narcotics trafficking. Id. at 36. When he took the DVD player out of its packaging, Officer Novacek saw something wrapped in foil was inside what would have been the DVD port.

After he saw something wrapped in foil in the DVD port, Officer Novacek took the package back to the squad car, again asked Lawrence about the name on the package, disassembled the DVD player, and located individual packages of what he believed to be fentanyl pills, wrapped in foil, inside the device. (Video 2, 28:50). The Second Superseding Indictment charges Lawrence "possessed approximately 3,000 pills containing a mixture and substance containing fentanyl with the intent to distribute" in Fargo on March 8. (Doc. 297, p. 3).

Officer Novacek then decided to arrest Lawrence and placed him in handcuffs. (Tr. 83). While placing the handcuffs, Officer Novacek asked Lawrence if he had been around anyone who had recently smoked marijuana, and Lawrence confirmed he had been. Officer Novacek testified Lawrence at no time denied the red Kia smelled like marijuana. While Lawrence was in the back seat of the squad car, Officer Novacek took a second cell phone from Lawrence and testified a person having two cell

[2] The dash camera video shows three other uniformed personnel arrived after Office Marvig, but the record includes no evidence about any involvement they may have had in the traffic stop or in searches of the vehicle or package. (See Video 2, 36:27).

phones was consistent with drug trafficking activity.[3] Officer Novacek testified he read Miranda rights to Lawrence when detaining him. After completing the search of the package, Officer Novacek told Lawrence he was being arrested for possession with intent to deliver and put him in handcuffs. Officer Novacek asked Lawrence if he wanted to work with him or tell him anything, and Lawrence gave no response. (Video 2, 39:57-42:18; Video 3, 39:19-42:15). Lawrence declined Officer Novack's request that he provide a password for a cell phone. Officer Novacek transported Lawrence to the Cass County Jail in Fargo. After the squad car was parked outside the jail, Officer Novacek again asked Lawrence if he wanted to tell him anything, and Lawrence again declined to respond. (Video 2, 01:07:20-01:08:33).

### 3. Ownership of the Red Kia

When cross-examined, Detective Heller testified that, at the time of the March 8 traffic stop, he knew Saibu owned the red Kia, though on redirect-examination, he testified he had not known the name of the registered owner until Officer Novacek told him a name. (Tr. 40, 46).

Officer Novacek testified when he asked Lawrence to step out of the vehicle to look at the registration date on the license plate, Lawrence made a statement to the effect of "usually I just renew the registration at the end of the month, and then it's good to go." Id. at 118. Lawrence later told Officer Novacek his cousin owned the red Kia, but when Officer Novacek said the name of the person he found listed as the registered owner, Lawrence said his cousin had recently purchased the vehicle. (Video 2, 02:30-03:35; Video 3, 02:33-03:32).

Three screenshots from Officer Novacek's body camera are in evidence. Those exhibits show the documents Lawrence provided as proof of insurance, and they appear to identify Saibu as a "new owner" of the red Kia. (Doc. 362-1, Doc. 362-2, Doc. 362-3); (see also Tr. 91-96). Officer Novacek testified he had paid attention to insurance information in the documents and not to information in the documents about ownership of the red Kia. (Tr. 117). Officer Novacek acknowledged there was no report suggesting the red Kia had been stolen. Id. at 109.

Lawrence presented testimony of his cousin, Saibu. Saibu testified she purchased the red Kia in California—"somewhere near Sacramento or something like that"—in 2021 or 2022, paid four to five thousand dollars for it, did not remember the name of the male from whom she purchased it and could not describe him, had insurance on the vehicle but did not remember

---

[3] The interior squad car video shows Lawrence using a cellphone while he was in the back seat of the squad car and Officer Novacek was not present, but it does not appear Lawrence verbally communicated with anyone else during that time. (See Video 3, 30:50-32:00).

the name of the insurance company, had no documentation showing ownership of the red Kia, and was unaware there was no record of her ever being the registered owner of the vehicle in either North Dakota or California. Id. at 153-57. Further, Saibu testified she gave Lawrence permission to use the vehicle on March 8. Id. at 137. She acknowledged she did not have a driver's license at the time of the traffic stop, though she owned a vehicle. Id. at 155.

On cross-examination, the United States questioned Saibu about her involvement in drug trafficking. She denied involvement in facilitating shipments of fentanyl to Fargo for Lawrence and his brother, Ennis, denied she lived with Ethmonia Barclay on 16th Avenue South, denied she accepted payment for drug transactions on her CashApp account, denied knowing Barclay told other people to send money to Saibu's CashApp account for drug transactions, and did not remember receiving text messages about drug transactions in February 2022. Saibu testified the package that was in the red Kia on March 8 had "nothing to do with [her]," denied knowing the package contained fentanyl pills, acknowledged she had been at Barclay's apartment on March 8 but denied knowing Lawrence had stopped at Barclay's address shortly before he was pulled over in the red Kia, denied knowing Lawrence had told police the package in the red Kia was for her, and denied the package was for her. Id. at 147-50.

Later on March 8, Saibu was with Ennis and Barclay in a vehicle that was stopped at a Fargo gas station. Saibu denied knowing there was a large sum of cash, a gun, and a quantity of fentanyl pills in the vehicle that was stopped. Barclay's apartment was also searched on March 8, and Saibu denied knowing there had been drugs and a handgun in Barclay's apartment. Id. at 152.

After a period of cross-examination, Saibu refused to answer additional questions, asserting the prosecutor was trying to confuse her. Id. at 157. The United States then moved to strike her testimony but withdrew that motion after calling a rebuttal witness—[Federal Bureau of Investigation] Special Agent [Caleb] Williamson.

Special Agent Williamson testified about the FBI's research into Saibu's driving history and research into registration records for the red Kia. He testified queries of California and North Dakota motor vehicle records showed Saibu was not the registered owner of a vehicle in either state. Id. at 160. During a search of Barclay's apartment, law enforcement found a Non-Driver Identification Card issued to Saibu on March 1, 2022. (See Doc. 362-6). Though Special Agent Williamson identified the document as a license issued to Saibu on March 22, 2023, the document received in evidence is actually a North Dakota Driver's License Division Record Status report showing her license was suspended as of that date. (See Doc. 362-4).

Though no report of ATF Special Agent Nicholas Bradt is in the record, testimony established Special Agent Bradt authored a report stating Saibu owned the red Kia. (Tr. 89, 162-63). Special Agent Williamson confirmed a report by Special Agent Bradt identified Saibu as the owner of the red Kia but testified that appeared to be a "typographical error." Id. at 163-64. Further, he testified an earlier report by Special Agent Bradt identified Michell Robles-Gutierrez as owner of the red Kia and Saibu as owner of a different vehicle. Id. at 164. Special Agent Williamson recognized Robles-Gutierrez's Sacramento address on a California motor vehicle record as an address associated with a codefendant charged in a case joined with this case. Id. at 165.

Additionally, Special Agent Williamson authenticated a California vehicle registration card, issued March 28, 2022, but valid from March 2, 2022, to March 2, 2023, showing Jessicah Regina Ann Eckley, of Elk Grove, California, as the registered owner of the red Kia. (Doc. 362-5). Special Agent Williamson testified Eckley was "known to be associated" with Ennis. (Tr. 166). Special Agent Williamson testified he obtained that registration card from a cooperating witness who had purchased the red Kia and also testified the cooperating witness had trafficked drugs for the codefendant charged in a case joined with this case. Id. at 168.

### 4. Ownership of the Package

While Lawrence was in the back seat of the squad car for the second time, Officer Novacek asked if he knew anything about the package on the red Kia's front seat, and Lawrence told him the package was a gift for his cousin, Saibu, though the name on the package was that of Korlu Barclay, and denied the package was for him. (Video 3, 22:17-22:32). After Officer Novacek opened the package and saw something in the DVD port, he asked Lawrence if he knew anything about the package, and Lawrence did not respond. (Tr. 83; Video 2, 29:08-30:00; Video 3, 29:08-30:00).

During a brief period in January 2024, after the court allowed appointed counsel to withdraw and before the court appointed substitute counsel, Lawrence filed a pro se motion to suppress, which included several references to the searched package as "my mail." (Doc. 264, p. 3). The motion was denied a few days after it was filed, since substitute counsel had then been appointed. (Doc. 266). In a footnote, the United States argues the pro se filing does not change the analysis of Lawrence's expectation of privacy but that the United States will offer the filing as evidence Lawrence knowingly possessed the fentanyl pills found in the package. (Doc. 333, p. 13 n.6).

(Doc. 375, pp. 2-15).

### Evidence Presented at Second Hearing

During the December 11 hearing, Detective Heller testified that in 2022—the time relevant to this case—every FPD patrol vehicle, with the exception of those assigned to school resource officers, had a camera pointing toward the hood of the patrol vehicle and the camera system had a feature that captured license plate information—an ALPR system.[4] The ALPR data is collected through FPD's Axon system and is routinely retained in the system for ninety days. Tr. 2 at 13, 22.[5] He described the system as capturing photographs of license plates of vehicles the patrol vehicles meet in public areas. Those photographs depict the vehicle, a time stamp, and the location at which the photograph was taken. Further, he testified ALPRs do not capture data that is not accessible to the public. He gave examples of data the system could access—a license plate on a vehicle at the end of a private driveway or a vehicle in a parking lot near a street. The ALPR data is collected without consent from drivers. Id. at 9-11, 23-25, 38.

Generally, FPD uses ALPR data as an "investigative technique to create leads" in various types of investigations. Id. at 11. Detective Heller described the ALPR data collected from patrol vehicles as dependent on "a lot of variables . . . based on where that officer drives throughout their shift." Id. at 13. As Detective Heller described, any FPD sworn officer can search the ALPR data, without a warrant, if there is a criminal nexus giving reason to do so. Id. at 31-32.

Detective Heller testified that, sometime between March 1 and March 8, 2022, ATF Special Agent Bradt contacted him and asked him to search the red Kia's license

---

[4] FPD has since installed twenty-one cameras at fixed locations—intersection light posts or traffic lights; those cameras also link to the ALPR system.

[5] Tr. 2 refers to the hearing transcript filed at Docket 399.

plate number in the FPD's ALPR system. Detective Heller testified his search showed the red Kia had been parked "in the 3100 block of Third Street North on the roadway on the west side of the road" no less than ten times during February 2022. Id. at 14. He testified none of the ALPR photographs showed the vehicle in the parking lot of the apartment complex, none showed anyone inside or near the vehicle, and none showed people visible around the vehicle. ALPR photographs of the red Kia were not maintained in the Axon system. Detective Heller testified he likely relayed the search results to Agent Bradt verbally. Detective Heller also searched vehicle registration information and learned the red Kia was registered to a female from Sacramento, though there is no evidence of when he searched the registration information. Id. at 13-15, 26-27, 32.

On March 8, the day of the traffic stop, Detective Heller conducted surveillance at the Third Street North address in an attempt to arrest Ennis on a warrant for a parole violation. He testified neither he, nor anyone else on the investigative team, looked at ALPR data to determine whether the red Kia was at the address that day because having followed the vehicle from Scheels to the address on March 1, "we had a pretty good idea that's where we could locate the vehicle." Id. at 16. Further, he testified there were no other Fargo locations known to be associated with the red Kia and the only other Fargo location known to be associated with Ennis was the 16th Avenue South address. Detective Heller testified that if ALPR data had not existed, he would still have gone to the Third Street North address to conduct surveillance that day. Detective Heller testified that because the vehicle had been in the parking lot at the Third Street North address, the ALPR system captured no photographs that would have shown the red Kia at the Third Street North address on March 8. Id. at 16-18.

When he surveilled the Third Street North address on March 8, Detective Heller saw Lawrence exit the apartment complex, walk to the parking lot where the red Kia was parked, drive the red Kia to the 16th Avenue South address, go into the apartment building, "quickly come out[,] and then leave again." Id. at 18. Because of the route Lawrence drove, Detective Heller believed Lawrence was returning to his apartment and believed the red Kia and "whoever was occupying it at that time" was involved in drug trafficking. Id. at 18.

After he saw the red Kia heading back to the Third Street North address, Detective Heller radioed for any officers available to make a traffic stop, and Officer Novacek responded to that request. Detective Heller testified none of his conversations with Officer Novacek during the traffic stop involved any mention of the ALPR search or the results of that search. He testified the ALPR data was not important to the investigation and he could have done "the exact same thing that [he] did without ALPR." Id. at 19.

## Law and Discussion

The only question raised in the current motion that was not addressed in the first motion to suppress is whether law enforcement's use of ALPR data violated Lawrence's Fourth Amendment rights. If using ALPR data is not a search under the Fourth Amendment, there could be no Fourth Amendment violation.

### 1. Collecting ALPR Data as a Fourth Amendment Search

Lawrence argues law enforcement's warrantless collection and use of ALPR data violated his Fourth Amendment rights, asserting he maintains a "reasonable expectation of privacy in his physical movements even when those movements occur in public spaces." (Doc. 382, p. 3). He asserts ALPR technology enables government surveillance

that was not yet possible when cases like United States v. Jones, 565 U.S. 400 (2012), and Carpenter v. United States, 585 U.S. 296 (2018), were decided and Fourth Amendment protections should evolve along with technology, as the Supreme Court noted in Kyllo v. United States, 533 U.S. 27, 28 (2001). Id. at 4, 14-15.

In Jones, the Supreme Court held the government's warrantless installation of a GPS tracking device on a vehicle constitutes a search under the Fourth Amendment. While the majority relied on a trespass theory, Lawrence argues Justice Sotomayor's concurrence outlines the privacy implications of GPS location tracking, where she noted such warrantless tracking creates a "precise, comprehensive record of a person's public movements." 565 U.S. at 415 (Sotomayor, J., concurring). Lawrence also quotes Justice Alito's concurrence, arguing it demonstrates that under the Fourth Amendment, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." Id. at 430 (Alito, J., concurring).

The Supreme Court expanded the Fourth Amendment protections of Jones in Carpenter, holding the government's warrantless acquisition of historical cell-site records from the defendant's wireless carrier violated the Fourth Amendment. The court noted an individual's cell phone, as compared to a vehicle as in Jones, is almost a "feature of human anatomy" allowing the government to track nearly exact movements of its owner. Id. at 311 (quoting Riley v. California, 573 U.S. 373, 385 (2014)). Lawrence argues that, like GPS tracking in Jones and historical cell-site records in Carpenter, ALPR systems provide law enforcement with warrantless access to an individual's

historical location information that reveals private patterns and associations in violation of the Fourth Amendment. (Doc. 382 p. 4).

The United States urges the court to

> rebuff Lawrence's invitation to issue a sweeping ruling on the general constitutionality of ALPR and instead confine its analysis to what happened here. ALPR did not follow Lawrence everywhere he went. It did not follow him into a family home, a political meeting, a business, a house of worship, or someone's bedroom. It captured a handful of pictures over a month of a red car not even registered to him sitting empty on a single public street in front of an apartment complex. That is not a precise, comprehensive record of a person's public movements. That is not a wealth of detail about [Lawrence's] familial, political, professional, religious, and sexual associations. That is not secretly monitor[ing] and catalog[ing] every single movement of an individual's car for a very long period. That is not almost a feature of human anatomy that achieves near perfect surveillance, as if [the government] had attached an ankle monitor.

(Doc. 390, p. 10) (internal quotation marks and citations omitted).

The government asserts "every federal court to consider the question has soundly rejected the same arguments Lawrence makes now" and Lawrence "fails to cite even one case finding that collection and use of ALPR data constitutes a Fourth Amendment search mandating a warrant." Id. The government then goes on to cite to eleven cases supporting its position. Id. at 11.

The cases the government cites rely on United States v. Knotts, where the Supreme Court held "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. 276, 281-82 (1983). The Court reasoned a person traveling on public roads voluntarily conveys to anyone who wants to see "the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." Id. The Eighth Circuit has concluded that "no person possesses a privacy interest in their

license plates." United States v. Sparks, 37 F. App'x 826, 829 (8th Cir. 2002) (citing United States v. Walraven, 892 F.2d 972, 974 (10th Cir. 1989)). Other district courts have reached the same conclusion. See, e.g., United States v. Cooper, No. 23-131, 2025 WL 35035, at *5 (E.D. La. Jan. 6, 2025); United States v. Bowers, No. 2:18-CR-00292-DWA, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

Although neither the Supreme Court nor the Eighth Circuit has directly ruled on the question, other courts have held that law enforcement's use of ALPR data is not a search under the Fourth Amendment because ALPR data is distinguishable from other types of surveillance in that it is significantly less comprehensive. For example, in United States v. Jiles, the court found accessing an ALPR database is not a search within the meaning of the Fourth Amendment because although "law enforcement can utilize the ALPR database to receive location information on individual cars over lengthy periods, the ALPR database is substantially limited relative to a GPS monitor, as in Jones, or cell-site location information, as in Carpenter." 2024 WL 891956, at *19 (D. Neb. Feb. 29, 2024). A GPS tracking device, such as was at issue in Jones, tracks a vehicle's movement to every location to which it travels. See Jones, 565 U.S. 400 (2012). "By contrast, the ALPR system records a vehicle's location only when it passes one of the limited (though expanding) number of ALPRs," Scholl v. Illinois State Police, 776 F. Supp. 3d 701, 720-21 (N.D. Ill. 2025), but does not involve a "physical intrusion by the [g]overnment to any private property." Jiles, 2024 WL 891956, at *15-19. Unlike historical cell-site location data, such as that involved in Carpenter, ALPR data does not create an all-encompassing record of an individual's whereabouts or create a detailed log of their precise movements. See United States v. Sturdivant, 786 F. Supp. 3d 1098, 1111-12 (N.D. Ohio 2025); see also Carpenter, 585 U.S. at 311. Some of the cases the

government cited involved ALPRs mounted on utility poles, which gather significantly more information than the method of collection employed here, and could thereby invite further issues under the Fourth Amendment. See United States v. Jackson, No. 24-cr-10010, 2025 WL 1530574 (D. Kan. May 29, 2025); United States v. Martin, 753 F. Supp. 3d 454 (E.D. Va. 2024).

Courts have declined to categorize use of ALPR data collections as impermissible dragnet searches. See, e.g., Sturdivant, 786 F. Supp. at 1113; United States v. Martin, 753 F. Supp. 3d 454, 472 (E.D. Va. 2024) (noting ALPR systems are not designed to "track or monitor the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life") (internal quotations omitted); United States v. Yang, 958 F.3d 851, 864 (9th Cir. 2020) (Bea, J., concurring in the judgment) (noting that only if ALPR technology evolves to provide more pervasive and precise location information akin to that in Carpenter, "then perhaps in the future a warrant may be required for the government to access the [ALPR] database"); United States v. Rubin, 556 F. Supp. 3d 1123, 1127-29 (N.D. Cal. 2021) (same). Lawrence cites to Commonwealth v. McCarthy, where the Massachusetts Supreme Judicial Court noted that "with enough cameras in enough locations, the historic location data from an ALPR system . . . would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes." (Doc. 382, p. 7) (quoting 142 N.E. 3d 1090, 1104 (Mass. 2020)). While that may prove true in the future, at this time, the method of ALPR technology FPD employed does not rise to a level invading a reasonable expectation of privacy constituting a Fourth Amendment search.

Lawrence cites no case law adopting the position he posits. Nor has this court's research identified cases doing so. Lawrence has not advanced arguments sufficient to

lead the court to conclude use of ALPR data should be considered a Fourth Amendment search. Even if the conclusion were theoretically viable, the evidence shows ALPR data was not a factor contributing to the traffic stop and the package search that followed. This court recommends the district judge conclude the use of ALPR data was not a search under the Fourth Amendment and did not violate Lawrence's constitutional rights.

**2. Independent Source Doctrine**

If, however, the district judge concludes use of the ALPR data violated Lawrence's Fourth Amendment rights, the government asserts application of the independent source doctrine. The government argues, even without the ALPR data, reasonable suspicion supported investigating the red Kia for drug trafficking on March 8. Supporting that position, the government cites evidence that law enforcement observed the red Kia in the Scheels parking lot and followed it from there to Third Street North. In the government's view, detective Heller would have "gone to the same place, at the same time, seen Lawrence make the same short-term trip to Ethmonia Barclay's apartment, and made the same radio call resulting in the vehicle being stopped for expired registration even if he had never looked at the ALPR database." In the view of the government, ALPR data "provided an insignificant corroborative detail about the red Kia that played no role whatsoever in establishing reasonable suspicion to investigate the vehicle for drug trafficking." (Doc. 390, p. 12). This court agrees.

The independence source doctrine permits an unlawful search to thwart suppression "if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact was acquired (or reacquired) by these lawful means." United States v. Baez, 983 F.3d 1029, 1037 (8th Cir. 2020). But, if the district

judge concludes collection and use of ALPR data is not a search that violated Lawrence's Fourth Amendment rights, application of the independent source doctrine need be considered.

### 3. Issues Previously Decided

Lawrence's second motion to suppress, (Doc. 381), and the government's opposition, (Doc. 390), raise arguments regarding Lawrence's standing to challenge the search of the package and about whether the collective knowledge doctrine and the automobile exception may be applied to cure any constitutional deficiencies in the acquisition and use of the ALPR data. But, in this court's opinion, neither party has shown reason for the court to reconsider any of those issues.

#### A. Collective Knowledge Doctrine

Lawrence argues the collective knowledge doctrine cannot cure law enforcement's underlying Fourth Amendment violation—the warrantless ALPR data collection. (Doc. 382, pp. 5-6). The collective knowledge doctrine imputes the knowledge of one law enforcement officer to another so the combined knowledge of multiple officers can justify the actions taken. United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001). The United States asserts the court should reject Lawrence's arguments regarding collective knowledge as it did in denying the first motion to suppress. (Doc. 390, p. 9). This court agrees. The district judge adopted this court's recommendation rejecting Lawrence's arguments regarding the collective knowledge doctrine, (Doc. 386, pp. 3-4), and Lawrence has not shown reason to conclude otherwise.

### B. Application of Automobile Exception to Package Search

The district judge adopted this court's recommendation and concluded the probable cause that existed to search the red Kia extended to containers in the vehicle that could have contained contraband. (Doc. 386, pp. 5-6). Specifically, this court recommended the district judge conclude "Officer Novacek's detection of the odor of marijuana provided probable cause to search the vehicle and any containers within the vehicle that could have contained marijuana. Because a package the size of a DVD player could have contained marijuana, Officer Novacek had probable cause to search the package." (Doc. 375, p. 29). The district judge adopted this court's recommendation and Lawrence has not shown reason to conclude otherwise.

### C. Standing to Challenge the Package Search

The United States argues Lawrence lacks standing to challenge the package search. In its prior report and recommendation, this court analyzed the question of Lawrence's standing to challenge the search of the package and recommended "the district judge assume, without deciding, that Lawrence has standing to assert his Fourth Amendment claims concerning the package." (Doc. 375, pp. 20-22). The district judge adopted that recommendation. (Doc. 386, p. 2). The United States argues the court "should now definitively conclude standing for the package is absent." (Doc. 390, p. 5). But, given this court's recommendation regarding use of ALPR, and the minimal use of ALPR in this case, the United States has not shown reason to again address the question of standing.

## Recommendation

Under current case law, law enforcement's use of ALPR data is not a search under the Fourth Amendment. Therefore, Lawrence's arguments that his Fourth Amendment rights and reasonable expectation of privacy were violated and that ALPR data collection amounted to an impermissible dragnet surveillance are unsupported. Moreover, evidence shows ALPR data was not a factor contributing to the traffic stop or to the package search that followed.

This court, for the reasons stated herein, **RECOMMENDS** the district judge **DENY** Lawrence's second motion to suppress evidence.

Dated this 15th day of January, 2026.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT[6]

Either party may object to this Report and Recommendation by filing with the Clerk of Court no later than **January 29, 2026**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

[6] See Fed. R. Crim. P. 59; D.N.D. L. Crim. R. 59.1(D)(3).

driver of the vehicle identified. It was very, very loose information.

Q. Was it your understanding that the purpose of this traffic stop was to help further the investigation that Detective Heller had?

A. Yes.

Q. And if there were any traffic violations that were found, that would be another purpose for the stop as well?

A. Correct. Yes. Specifically asked me to find a reason, my own reason, to make the traffic stop.

Q. Is that a common practice in narcotics investigations?

A. Yes, to -- for the officer to develop their own reasonable suspicion to make that stop if none doesn't exist prior to that.

Q. What was the vehicle description that you were given?

A. A red Kia passenger vehicle with California license plates.

Q. Did you know anything about who the targets were of the investigation when you went to initiate the traffic stop?

A. I did not.

Q. Okay. Were you able to find the car that Detective Heller described to you?
A. Yes. I located that vehicle shortly after exiting northbound I-29 onto 19th Avenue North.
Q. What did you do when you found the vehicle?
A. Immediately ran the license plate, and in doing so, found that the California vehicle registration was expired by several days.
Q. Did you initiate a traffic stop at that point?
A. I did.
Q. Do you recall approximately what time that was?
A. It would have been around the noon hour, shortly before that sometime.
Q. When you started the traffic stop, did you initiate your body camera?
A. Yes. That kicks on automatically.
Q. And is that true also for your squad car?
A. Yes.
Q. And are there more than one camera on the squad car?

A. Yeah. There is a -- yes. There is a forward-facing camera and one that faces the cage portion of our vehicle.

Q. And each of those cameras was functioning properly that day?

A. They were.

Q. And you've had the chance to go back and review the video from each of those cameras?

A. Yes.

Q. And they appear to be accurate representations of what happened during the traffic stop?

A. Yes.

Q. Okay.

MR. KOPP: Your Honor, we don't intend to formally offer the bodycam exhibits or the squad car, and Mr. Sandberg and I spoke before the hearing and agreed that since the Court has already received them through briefing that those would just be to the Court as evidence.

THE COURT: You're offering all three videos?

MR. KOPP: We would offer all three to the extent they need to be offered beyond the briefing.

MR. SANDBERG: No objection, Your Honor.
THE COURT: They will be received.
Do we have numbers?
MR. KOPP: We don't, Your Honor. They were numbered in the -- in the briefing as Defendant's Exhibit Number 1 and then as our Exhibit Number 1 and Number 2, and they both are -- have docket numbers as well.
MR. SANDBERG: Your Honor, I think mine was Exhibit A, I want to say, wasn't it? Defendant's Exhibit A, so --
MR. KOPP: That does make it easier.
THE COURT: Thank you.
MR. KOPP: Thank you, Your Honor.
Q. (BY MR. KOPP) So when you initiated the traffic stop, what, in your mind, were the purposes for the traffic stop when that happened?
A. To assist with the investigation that Detective Heller was conducting.
Q. What was the weather like that day?
A. It was very, very cold. I'm not sure exactly what the temperature was outside, below freezing, maybe in the high 20s, which doesn't sound so bad; however, the wind was a huge factor that day, blowing somewhat -- somewhere in the

nature of 25 to 30 miles an hour, making it very, very difficult to be outside.

Q. This traffic stop happened on 19th Avenue North right near the Fargodome. Is that correct?

A. That's correct.

Q. Is that known to be a particularly windy area?

A. It is. And, in fact, 19th Avenue North is closed frequently during blizzard conditions because of the openness of that area.

Q. What did you do when you first approached the vehicle?

A. I introduced myself as a Fargo police officer. Passenger side approach, which is a safer approach for me to do in a situation like that. Explained my reason for stop and asked the driver of the vehicle for license, registration, insurance, things like that.

Q. How many people were in the car?

A. One.

Q. Were you able to identify the driver of the vehicle at some point?

A. Yes.

Q. And who was that person?

A. The Defendant, Adolph Lawrence.
Q. And do you see Adolph Lawrence sitting here in the courtroom?
A. I do.
Q. Can you just briefly describe where he's sitting and what he's wearing?
A. Sitting in the defendant bench wearing a blue sweatshirt.
MR. KOPP: Your Honor, we would ask that the record reflect that the witness has identified the Defendant.
THE COURT: It does so reflect.
MR. KOPP: Thank you.
Q. (BY MR. KOPP) Did you notice anything in the vehicle when you first approached?
A. When I first approached, the only thing I noticed was a package on the front passenger's seat of the vehicle.
Q. What were you able to observe about that package?
A. I could only see a name at that point. The name was Korlu Barclay.
Q. Did that name have any meaning to you at the time?
A. It's a name that I have heard briefly

throughout my calls for service, things like that. It's -- it's a name I'm familiar with, but no specific instance comes to mind.

Q. How long were you at the passenger side window for when you first approached?

A. No more than 15 seconds.

Q. Did you smell the odor of marijuana at that point?

A. Not at that point.

Q. Are there some factors that might impact when you would or wouldn't be able to smell marijuana?

A. Absolutely. Your environment is a -- is a huge part of that, so with the wind being what it was, positioning of the vehicle, the passenger side approach with the driver's side window being closed, no air passing through the vehicle at that time, all of those things are a factor. Absolutely. The cold weather in and of itself personally affects me. It's harder to smell those things when it's hard to breathe through your nose.

Q. So after you asked Adolph Lawrence for his license, registration, the initial information during the traffic stop, did you

Q. Okay. So after the initial questioning in the squad car, what did you decide to do with the traffic stop at that point?

A. So at that point my decision was I was not going to give Adolph any citations. I gave him a warning about not having his license, made sure that he knew that he needs to have that with him.

I explained that I wasn't going to give him a citation for the registration or a suspended license and that I just needed to see the vehicle's insurance information, which was not provided at the beginning, and then he would be free to go should everything be in order.

Q. Okay. And did you walk with Adolph Lawrence back to the vehicle so he could retrieve some kind of proof of insurance?

A. I did, yes.

Q. What happened at that point?

A. At that point, I walked behind him. He approached the passenger's side and opened the door and retrieved the insurance information out of the glove box. He handed me approximately three or four pieces of paper, which is an uncommon thing to hand somebody for proof of

vehicle. Okay?

(Defendant's Exhibit A published.)

Q. (BY MR. SANDBERG) Okay. So I'm stopping it at 12 minutes and 33 seconds. That's obviously -- you're at -- you're at the front end -- front of his vehicle again?

A. So I would be positioned right next to the rear right side passenger door.

Q. And at this point, you didn't smell anything?

A. No.

Q. Okay. So you didn't smell any marijuana?

A. No.

Q. All right.

(Defendant's Exhibit A published.)

Q. (BY MR. SANDBERG) Now, you ended up approaching the vehicle a third time. Right?

A. That's correct.

MR. SANDBERG: Okay. I'm going to go to 17:29 of the video. 17:22, I guess.

(Defendant's Exhibit A published.)

Q. (BY MR. SANDBERG) All right. So now I'm stopping it at 17:30. Now you're closer; you know, you're back up at the front of his vehicle

squad would be facing west.
Q. Okay. And -- but again, you didn't smell any marijuana at this point?
A. Correct.
Q. Burnt or -- burnt marijuana you didn't smell?
A. Correct.
Q. And, obviously, there's a smell of just marijuana unburnt. Right?
A. Yes.
Q. You didn't smell that either?
A. I did not.
Q. Okay. How close do you think you were at this point to him?
A. Several feet.
Q. Okay.
A. Maybe a foot.
Q. Now, he -- you actually -- he gets back out of the vehicle. Right?
(Defendant's Exhibit A published.)
A. Correct.
Q. (BY MR. SANDBERG) So I've got a question about the -- the -- your patrol car. Obviously, in -- right now, we're at 1 minute and 27 seconds. You're in the -- in the driver's

side of your vehicle, front driver's side. Right?

A. Yes.

Q. And he's in the back to your -- back passenger right side of yours. Right?

A. Yes. So he would be in the rear right-side passenger seat.

Q. And you're talking to him?

A. Yes.

Q. And I'm -- I'm assuming that for you to hear him there had to have been a window open. Is that fair to say, there's a window open?

A. There is a partition that is able to be opened. I don't recall whether it was closed or open at this time.

Q. Would you be able to hear him and have a good conversation if the -- if the partition was shut?

A. Yes.

Q. Okay. So it would sound just like that?

A. It would be slightly muffled, but it would still be -- I would still be able to hear him.

Q. Do you normally want to have it shut when you're talking to people in the back seat?

A. Extremely common.
Q. And does that include finding marijuana residue?
A. Yes.
Q. Were you on duty on March 8, 2022?
A. Yes.
Q. And did you receive a radio dispatch to, essentially, help assist with a traffic stop?
A. Yes.
Q. All right. What -- what did you do when you heard that radio dispatch?
A. I made my way to Officer Novacek.
Q. And was Officer Novacek the one who put out the call?
A. Yes.
Q. Okay. And where was the traffic stop happening at?
A. The 1500 block of 19th Avenue North in Fargo.
Q. Is that near the Fargodome?
A. Yes.
Q. What happened when you arrived at the scene of the traffic stop?
A. I exited my patrol car. Officer Novacek was on the passenger's side of the vehicle, which

was unoccupied at that point, with the front passenger side door open, and I spoke with him there.

Q. After speaking with him, did you assist with the search of the vehicle?

A. At his request, yes.

Q. Where did you start at?

A. The driver's door.

Q. Did you notice anything when you opened the driver's door?

A. I immediately noticed and articulated a strong odor of marijuana.

Q. Did you find anything inside of the car related to that smell?

A. On the driver's floorboard I noted that there was what's commonly referred to as shake, very small pieces of a green leafy substance consistent with marijuana, in the carpet and then some clues to -- consistent with marijuana usage in the car.

Q. Okay. And what were the clues that you mentioned that were consistent with marijuana use in the car?

A. I noticed a portable vacuum, like a battery-powered, small hand vacuum, in the back

So it could be -- there's a lot of variables on what data ALPRs can collect based on where that officer drives throughout their shift.

Q. Does ALPR technology collect constant surveillance data on vehicles in the city of Fargo?

A. No.

Q. How long does the Fargo Police Department retain ALPR data for once it's collected?

A. 90 days in Axon.

Q. And that's for the squad cars; is that correct?

A. The squad cameras, correct.

Q. Is the flock cameras slightly different than that?

A. Yes, they're at 30 days.

Q. Okay. Do you still have access to the ALPR photographs that were taken related to this case?

A. I do not.

Q. Okay. And what happened there?

A. I don't recall. I ran the ALPR through our system of the vehicle, the -- the California plate for the Kia, and we don't have that -- the actual data for that or the screen grab.

I either contacted the agent involved and advised him what the search came up with or I may have emailed him the information, but we do not have it anymore unfortunately.

Q. And would that be a common thing for you to do would be to just call and verbally relay what you --

A. Yeah. In my -- in my current role as the intelligence detective at the Fargo Police Department, I get a lot of calls on our LPR systems and -- to run plates, and it's usually a quick call; hey, can you run this plate to see where it's been in Fargo or if it has been in Fargo.

And I ask whether if it's a special agent or another detective in a jurisdiction to ask for a case number and reason to why I'm searching that.

Q. The data can be preserved for longer if it's flagged for further investigation, correct?

A. Correct.

Q. But in this case that wasn't done as you relayed the information, right?

A. Correct.

Q. Okay. So in this case were you able to identify the license plate number on the red Kia that you followed from Scheels to the apartment in north Fargo?

A. Yes.

Q. Did you run that license plate number through the Fargo Police Department ALPR system?

A. Yes.

Q. What was the result of that search?

A. The search gave us a result of no less than ten reads of the vehicle being parked in front of -- or I believe in the 3100 block of Third Street North on the roadway on the west