No. 26-2591

# United States Court of Appeals for the Eighth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ADOLPH AKWE LAWRENCE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of North Dakota-Eastern
No. 3:22-cr-00069-PDW-3; Hon. Peter D. Welte, Chief Judge

## BRIEF OF PROJECT FOR PRIVACY & SURVEILLANCE ACCOUNTABILITY, INC. AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL

Gene C. Schaerr
*Counsel of Record*
Erik S. Jaffe
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*

OCTOBER 8, 2026



Appellate Case: 26-2591 Page: 1 Date Filed: 10/13/2026 Entry ID: 5693751

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Project for Privacy & Surveillance Accountability, Inc. (PPSA) states that it is a nonprofit, nonpartisan organization headquartered in Washington, D.C. PPSA has no parent corporation, and no publicly held corporation has 10% or greater ownership in it.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iv

INTRODUCTION, IDENTITY AND INTEREST OF *AMICUS CURIAE*, AND SOURCE OF AUTHORITY TO FILE .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 6

I. After *Chatrie*, the Search Inquiry Cannot Be Reduced to How Much Information a Particular Query Returned. .......... 6

A. The quantity of information returned by an ALPR query cannot resolve whether a search occurred. .......... 7

B. The qualitative characteristics of a surveillance mechanism inform whether retrospective access constitutes a search. .......... 9

II. Retrospective ALPR Querying Implicates the Qualitative Concerns That Distinguish *Carpenter* from *Knotts* .......... 11

A. Unlike in *Knotts*, Fargo's system automatically collected geolocated plate information before individualized suspicion arose and retained it in a searchable archive. .......... 11

B. Historical querying allowed officers, *after* identifying a target, to aggregate and retrieve the vehicle's previously recorded locations. .......... 14

C. The Fourth Amendment inquiry should focus on the character of the surveillance mechanism, not require a complete reconstruction of a person's movements. .......... 17

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE .......... 21

ECF CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28A(h)(2) .......... 22

CERTIFICATE OF SERVICE .......... 23

## TABLE OF AUTHORITIES

### Cases

*Carpenter v. United States*,
585 U.S. 296 (2018) .................................. 1, 9, 10, 11, 12, 13, 15, 16, 17

*Chatrie v. United States*,
146 S. Ct. 2193 (2026) .................................. 1, 3, 6, 8

*Katz v. United States*,
389 U.S. 347 (1967) .................................. 8

*Kyllo v. United States*,
533 U.S. 27 (2001) .................................. 7, 8

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) .................................. 5, 17, 18

*Schmidt v. City of Norfolk*,
819 F. Supp. 3d 492 (E.D. Va. 2026) .................................. 18

*United States v. Dewilfond*,
54 F.4th 578 (8th Cir. 2022) .................................. 16

*United States v. Hasbajrami*,
945 F.3d 641 (2d Cir. 2019) .................................. 17

*United States v. Jones*,
565 U.S. 400 (2012) .................................. 18

*United States v. Knotts*,
460 U.S. 276 (1983) .................................. 4, 5, 7, 12, 13, 14, 15

*United States v. Porter*,
170 F.4th 381 (5th Cir. 2026) .................................. 18

*United States v. Rubin*,
556 F. Supp. 3d 1123 (N.D. Cal. 2021); .................................. 18

*United States v. Sparks*,
37 F. App'x 826 (8th Cir. 2002) .................................. 7

### Rules

Fed. R. App. P. 26.1 .................................. i

Fed. R. App. P. 29 .................................. 1

## INTRODUCTION, IDENTITY AND INTEREST OF *AMICUS CURIAE*, AND SOURCE OF AUTHORITY TO FILE[1]

The Fourth Amendment does not measure a search by how much the government happens to come away with. Yet the district court's analysis ultimately turned on just that comparison. The court denied Lawrence's motion to suppress because the automated-license-plate-reader (ALPR) information about the red Kia at issue was "substantially less comprehensive" than the cell-site location information in *Carpenter v. United States*, 585 U.S. 296 (2018). R. Doc. 404, at 2. The court therefore concluded that querying the historical ALPR records was not a search. *Id.* But after *Chatrie v. United States*, 146 S. Ct. 2193 (2026), the limited information returned by a particular query cannot substitute for examining whether the government's query of the underlying location records constituted a search.

Instead, rather than focusing on how much data a given query yields, courts must now examine what the government did and how the

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person other than *amicus*, its members, or its counsel contributed money that was intended to fund the brief's preparation or submission.

surveillance system worked. And here, officers queried a database that automatically collected location records before individualized suspicion arose, retained and aggregated those records, and allowed investigators to retrieve a vehicle's historical locations after identifying it as a target. After *Chatrie*, at least the final step is a search.

This determination is critical to *Amicus* Project for Privacy and Surveillance Accountability, Inc. ("PPSA") is a nonprofit, nonpartisan organization dedicated to protecting privacy rights against government overreach. The warrantless retention and retrospective querying of location databases, including ALPR systems, is central to that mission, because such systems let the government reconstruct where a person has been from records automatically gathered long before any individualized suspicion. PPSA submits this brief to explain the framework that should govern retrospective access to a retained location database after *Chatrie*, and why the amount of information a single query returns cannot substitute for that analysis.

## SUMMARY OF ARGUMENT

The district court erroneously denied suppression because the ALPR information returned about Lawrence was "substantially less

comprehensive" than *Carpenter*'s cell-site data. R. Doc. 404, at 2. But that ground cannot be squared with the intervening *Chatrie* decision.

I. *Chatrie* clarified that (1) where the Fourth Amendment applies, coverage attaches "regardless of 'the quality or quantity of information'" the government obtains, and (2) whether conduct is a search "does not depend on what it finds." *Chatrie v. United States*, 146 S. Ct. 2193, 2210, 2212 (2026). The search inquiry therefore cannot turn on the number of records a particular query happens to return.

Yet here, the district court focused on the quantity and completeness of the information a particular query returned—here, the "no less than ten" reads the query produced. R. Doc. 401, at 12. But under *Chatrie*, that count describes only what investigators obtained, not the constitutional character of their access. That analysis requires considering first, the nature of the challenged governmental conduct—retrospective interrogation of historical location information automatically accumulated before investigators decide to query a plate. Second is the characteristics of the surveillance mechanism that makes that query possible: automatic collection, aggregation, retention,

retrospective searchability, and the ability to reveal historical location information.

Under both lines of analysis, retrospective ALPR querying implicates the qualitative characteristics that distinguish *Carpenter* from *United States v. Knotts*, 460 U.S. 276 (1983). *Carpenter* looked past the number of data points obtained to the character of the surveillance at issue. And several of the characteristics that concerned the Court in *Carpenter* are present here. The 2022 Fargo Axon system was mounted on patrol vehicles and automatically photographed "every vehicle it passe[d]," recording the vehicle's image and a time stamp and geolocation. R. Doc. 399, at 25. That collection occurs before any target emerges. The reads are retained for ninety days and aggregated by plate into a searchable archive. *Id.* at 13, 39. Officers may later query a plate and retrieve the vehicle's previously recorded locations, and they do so without a warrant. *Id.* at 28–29, 31. The government used that capability here to query the red Kia's plate and retrieve its recorded February locations. *Id.* at 26.

II. By contrast, the procedure approved in *Knotts* was a real-time, beeper-aided observation of a single journey on public roads. And the

Court there expressly reserved the question of mass or dragnet surveillance. 460 U.S. at 283–84. Here, Fargo's ALPR system works in reverse. Officers can identify a vehicle after an investigation begins and *then* retrieve location records accumulated before anyone followed it. The Fourth Circuit correctly treated that access as a constitutional event even where the government itself collected the data. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 347 (4th Cir. 2021) (en banc).

The constitutional analysis therefore should not turn on whether this query happened to reconstruct a sufficiently complete account of Lawrence's movements. Instead, it concerns retrospective interrogation of an automatically generated and retained historical-location archive, not ordinary visual observation, contemporaneous plate checks, real-time alerts, or routine government record checks.

Because the district court's Fourth Amendment analysis cannot survive *Chatrie*, this Court should hold that the output of a particular query cannot substitute for analysis of the surveillance mechanism and hold that the retrospective ALPR query here constituted a search, or, if further factfinding is warranted, at minimum vacate the denial of

suppression and remand for application of the correct Fourth Amendment framework.

## ARGUMENT

The district court erred on two related questions. First, the district court treated the limited results of an ALPR query as a reason to deny Fourth Amendment protection. Section I explains why *Chatrie* forecloses that approach. Second, the court failed to account for the retrospective surveillance that Fargo's system enabled. Section II shows why that capability implicates the concerns identified in *Carpenter*.

### I. After *Chatrie*, the Search Inquiry Cannot Be Reduced to How Much Information a Particular Query Returned.

The district court resolved the search question by comparing the ALPR information obtained here with the cell-site data in *Carpenter*. But that comparison overlooked a critical distinction in *Chatrie*: The amount of information obtained does not determine the constitutional protection owed to information in which a person has a reasonable expectation of privacy. To the contrary, "[w]here the Fourth Amendment applies, it applies—regardless of the quality or quantity of information the government obtains." *Chatrie*, 146 S. Ct. at 2210 (quoting *Kyllo v. United*

*States*, 533 U.S. 27, 37 (2001)). The district court therefore had to examine the character of the government's access, not merely its results.

### A. The quantity of information returned by an ALPR query cannot resolve whether a search occurred.

In its March 2026 order denying Lawrence's motion to suppress, the district court first invoked the rule that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." R. Doc. 401, at 15 (quoting *Knotts*, 460 U.S. at 281). It also quoted the Eighth Circuit's holding that "no person possesses a privacy interest in their license plates," concluding that a vehicle on public roads is categorically exposed, *id*. at 16 (quoting *United States v. Sparks*, 37 F. App'x 826, 829 (8th Cir. 2002)). It then distinguished ALPR data from the cell phone location data in *Carpenter v. United States* because it is "substantially less comprehensive," R. Doc. 404, at 2, and "does not create an all-encompassing record of an individual's whereabouts," R. Doc. 401, at 16.

The district court erred in treating the less comprehensive ALPR information as a principal reason the surveillance resembled *Knotts*, not *Carpenter*. After *Chatrie*, the output of a particular query cannot carry that threshold judgment. There, the Supreme Court held that "[w]here

the Fourth Amendment applies, it applies—regardless of the quality or quantity of information the government obtains." 146 S. Ct. at 2210 (quoting *Kyllo*, 533 U.S. at 37) . Whether a method yields ten records or ten thousand, the number alone cannot establish whether the government's conduct implicates a protected Fourth Amendment interest. A search of limited yield is still a search, whether it yields two hours of geolocation data, *id.* at 2215; eighteen minutes of phone recordings, *Katz v. United States*, 389 U.S. 347, 354 n.14 (1967); or one thermal imaging scan of a home, *Kyllo*, 533 U.S. at 30. The Fourth Amendment makes "no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Kyllo*, 533 U.S. at 37. Whether conduct is a search, *Chatrie* confirmed, "does not depend on what it finds." 146 S. Ct. at 2212.

The Court also rejected the related move of discounting an intrusion because the government drew only a limited set of records "from an all-encompassing database." *Id.* at 2210–11. The "sweep of the official invasion is not made less" by that hindsight selection. *Id.*

The district court's reliance on public exposure does not independently resolve the question. A person "does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 585 U.S. at 310. And *Carpenter* confined *Knotts* to its facts—short-range tracking of a "discrete" journey on public roads. *Carpenter*, 585 U.S. at 306. Neither public exposure nor the limited results of this query relieve the court of examining the retrospective surveillance that produced those results.

### B. The qualitative characteristics of a surveillance mechanism inform whether retrospective access constitutes a search.

In *Carpenter*, the Supreme Court identified qualitative characteristics of modern location surveillance that set historical cell-site records apart from the conventional public observation approved in *Knotts*. First, the surveillance was automatic rather than effortful, generating a record "without any affirmative act on the part of the user beyond powering up." *Carpenter*, 585 U.S. at 315. Second, it was retrospective, giving police access to "a category of information otherwise unknowable" and the power to "travel back in time to retrace a person's whereabouts." *Id.* at 312. Third, it was retained and effortless to retrieve,

"remarkably easy, cheap, and efficient compared to traditional investigative tools." *Id.* at 311. And fourth, its reach was broad and continuous. *Id.* at 311–12. Those characteristics together explained why accessing the records implicated a reasonable expectation of privacy. The scope of the surveillance mattered, but the Court did not establish a numerical threshold applicable to every form of location tracking.

Rather than focus on these characteristics, the district court focused on the amount of information Fargo's system collected. It emphasized the system's limited coverage and the resulting records, then concluded that the query was not a search because the information was less comprehensive than the data in *Carpenter*.

But the correct inquiry is qualitative. It asks what kind of governmental conduct the ALPR mechanism enables and what characteristics that mechanism shares with the surveillance *Carpenter* addressed. Because the district court did not make that inquiry, this Court should hold that the retrospective query constituted a search or, if further fact finding is warranted, vacate and remand for application of the correct framework under *Carpenter* and *Chatrie*.

## II. Retrospective ALPR Querying Implicates the Qualitative Concerns That Distinguish *Carpenter* from *Knotts*.

Fargo's ALPR system presents the kind of retrospective surveillance that *Knotts* did not address. *Carpenter* distinguished *Knotts*'s "rudimentary" tracking of a single journey from "more sweeping modes of surveillance." *Carpenter*, 585 U.S. at 306. And Fargo's system shares several characteristics of the surveillance examined in *Carpenter*. *See id.* at 309–12. Data is collected automatically rather than through effortful observation. It is collected before any investigative interest arises. It is then retained and aggregated into a searchable, government-held archive. And it may be retrieved retrospectively, cheaply and at will, to learn where a vehicle was during a period no officer followed it.

### A. Unlike in *Knotts*, Fargo's system automatically collected geolocated plate information before individualized suspicion arose and retained it in a searchable archive.

1. In contrast to the technology in *Knotts*, the Fargo ALPR system automatically collects location data. In 2022, every Fargo patrol vehicle except those assigned to school resource officers carried a hood-mounted camera with ALPR capability. R. Doc. 399, at 11, 22; R. Doc. 401, at 11. Each camera "run[s] throughout their whole shift" and while on "starts taking pictures of every vehicle it passes . . . ." R. Doc. 399, at 24–25. A

detective testified that the system performs "a constant data collection of license plates and locations of where that license plate was . . . ." *Id.* at 25. Each read is geolocated by the patrol car's GPS and bears a time stamp. *Id.* at 23. And the data is collected without the consent of the drivers or owners of the vehicles being photographed. *Id.* at 38. That "automatic nature" of data collection separates the surveillance system in *Carpenter*, 585 U.S. at 311–12, 320, from the beeper in *Knotts*, which merely emitted a signal that augmented an officer's live pursuit, 460 U.S. at 278.

Because collection is automatic, Fargo records a vehicle's location before officers develop any investigative interest in it. So here, the historical reads about the red Kia's location were automatically accumulated a month before investigators queried its plate, R. Doc. 399, at 14, 32. Those records were not collected in response to any investigative interest in the vehicle.

That practice let the government assemble a record of the past "without any affirmative act on the part of the user beyond powering up." *Carpenter*, 585 U.S. at 311. The *Knotts* beeper, by contrast, revealed nothing until installed and revealed nothing about the period before.

2. Fargo also retained those automatically collected records for later use. They are kept ninety days in Axon, R. Doc. 399, at 13, uploaded to a server, and "gather[ed] . . . by license plate number," *id.* at 39, so that future queries may return a plate's accumulated history. By contrast, the beeper in *Knotts* created no archive; it transmitted a real-time signal and nothing more. *Knotts*, 460 U.S. at 278.

Fargo's archive also let officers retrieve the red Kia's historical locations without having followed it. Any sworn officer could "search or query any plate," R. Doc. 399, at 28, 39–40, and obtain the vehicle's stored history—exactly the "remarkably easy, cheap, and efficient" access *Carpenter* flagged—but here collected by the government, not a cell phone company, *see* 585 U.S. at 311. The *Knotts* beeper was different in kind; officers still had to follow the car in real time. 460 U.S. at 277–78.

In short, the ALPR surveillance technology at issue here bears little resemblance to *Knotts*, other than involving a car. Because the Fargo ALPR system involves the automatic collection, retention, and aggregation of retrospectively searchable location information that *Carpenter* flagged, the district court erred in asserting that "no

reasonable expectation of privacy" exists for drivers subject to its cameras.

### B. Historical querying allowed officers, *after* identifying a target, to aggregate and retrieve the vehicle's previously recorded locations.

Fargo's ALPR system also enables the retrospective retrieval of location history, cheaply and at will. It does not merely "augment[]" the contemporaneous observations police would already make of a vehicle on public roads. *Knotts*, 460 U.S. at 282.

1. Retrospective retrieval means that any officer can query a license plate and receive its aggregated history: a record of the plate's captured encounters with the system, including their locations and times. R. Doc. 399, at 28–29, 39–40. And that ability exists not just for the eventual suspect. Records of other vehicles captured by the system likewise remain available for later queries.

Here, at the request of a federal agent, officers queried the red Kia's plate and retrieved "no less than ten" February reads showing the vehicle parked in the same area. R. Doc. 399, at 14, 32. And the query gave officers access to a past they had not observed. An officer conducting visual surveillance cannot go back in time to watch a vehicle for a month

when no one chose to follow it. But querying a searchable ALPR database lets him do exactly that. The proper comparison then is not to a lone officer following a beeper like in *Knotts*, but to an integrated mechanism like the one in *Carpenter* that makes backward-looking queries possible—automatic fleet collection, geolocation, retention, aggregation, and retrieval on demand.

The district court missed this distinction. R. Doc. 404, at 3–4. Its analysis followed the premise that a car, unlike a cell phone, "has little capacity for escaping public scrutiny," *Carpenter*, 585 U.S. at 311 (citation omitted), and from *Knotts*' statement that travel on public thoroughfares carries no reasonable expectation of privacy, *Knotts*, 460 U.S. at 281. R. Doc. 401, at 15–16. But *Knotts* addressed a beeper that tracked a single journey in real time. 460 U.S. at 281–82. And it reserved the different question presented by "dragnet type law enforcement practices," warning that "if such . . . practices . . . should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable," *id.* at 283–84.

*Carpenter* answered part of that reserved question, holding that aggregated, retrospective location surveillance can invade a reasonable

expectation of privacy even in public movement. That is because "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement" of a person over a long period. 585 U.S. at 310 (citation omitted). The district court's categorical treatment of a vehicle as beyond Fourth Amendment concern thus overreads *Knotts* and underreads *Carpenter*.

2. Nor does this Court's approval of visually equivalent GPS surveillance in *United States v. Dewilfond*, 54 F.4th 578 (8th Cir. 2022), resolve the question presented here. There, the GPS device "allowed law enforcement to conduct the same sort of surveillance it could conduct visually." *Id.* at 581. Fargo's historical ALPR archive presents a different capability. Officers need not identify a vehicle and then begin following it; they can identify the vehicle afterward and retrieve records of its earlier locations. That retrospective access—not the mere enhancement of contemporaneous observation—presents the Fourth Amendment question here.

That distinction remains important even though Fargo collected and possessed the records itself. As the Second Circuit explained in

*United States v. Hasbajrami*, "lawful collection alone is not always enough to justify a future search." 945 F.3d 641, 670 (2d Cir. 2019). Though not every query of government-held records is a search, *Hasbajrami* confirms that lawful collection does not resolve whether the government conducts a search when it later queries those records. *See Leaders of a Beautiful Struggle*, 2 F.4th at 347. And whether that retrospective access is a search cannot depend solely on how completely the stored records reconstruct a vehicle's movements.

### C. The Fourth Amendment inquiry should focus on the character of the surveillance mechanism, not require a complete reconstruction of a person's movements.

Nor does the Fourth Amendment require a surveillance system to reconstruct every movement before its retrospective use can constitute a search.

1. *Carpenter*'s reference to the "whole of [a person's] physical movements" described the effect of comprehensive cell-site records; it did not set a threshold that every surveillance technology must meet before the Fourth Amendment applies. *See Carpenter*, 585 U.S. at 310–11. The Fourth Circuit likewise recognized that gaps in a surveillance record do not necessarily defeat Fourth Amendment protection: The datasets in

*United States v. Jones*, 565 U.S. 400 (2012), and *Carpenter* "had gaps . . . too." *Leaders of a Beautiful Struggle*, 2 F.4th at 341–42.

So too here. Fargo's system was not comprehensive. Only 13 to 20 patrol cars operated at a time, and coverage depended on their routes. R. Doc. 399, at 11–13. But those limitations do not eliminate the system's capacity to collect, retain, and retrospectively retrieve historical location records. The Fourth Amendment inquiry must account for that capability, even when the resulting record contains gaps.

2. Other courts have still treated limited ALPR coverage as a substantial reason to distinguish *Carpenter*. *See, e.g.*, *United States v. Rubin*, 556 F. Supp. 3d 1123, 1127–29 (N.D. Cal. 2021); *United States v. Porter*, 170 F.4th 381, 387 (5th Cir. 2026); *Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492, 511 (E.D. Va. 2026). But each of these decisions predates *Chatrie*. And none considered its intervening instruction that the scope of a protected Fourth Amendment interest cannot be determined merely by the quantity of information ultimately obtained. Although the extent of a surveillance system's coverage remains relevant, the limited records returned by a particular query cannot substitute for examining the



Appellate Case: 26-2591 Page: 23 Date Filed: 10/13/2026 Entry ID: 5693751

nature of the government's access and the mechanism that made it possible.

The relevant constitutional question therefore concerns retrospective access to an archive that automatically collects, aggregates, and retains historical location records before investigators identified a target. It does not reach an officer's visual observation of a publicly displayed plate, a contemporaneous plate check, or a real-time ALPR alert. Nor does it treat every government database as constitutionally protected. The relevant distinction is between observing a vehicle as it travels and interrogating an accumulated record of where it traveled before investigators chose to follow it.

This Court should hold that the retrospective query constituted a search. At a minimum, the Court should vacate and remand so the district court can assess the nature of the challenged conduct and the characteristics of the mechanism that enabled it. That would include such issues as the manner of collection, its coverage, retention, aggregation, and retrospective searchability, not whether the system could reconstruct the whole, or some set fraction, of a person's movements.

## CONCLUSION

The district court's focus on the limited scope of Fargo's ALPR records disregarded the constitutional significance of retrospective access to an automatically collected and retained location archive. Under *Carpenter* and *Chatrie*, the Fourth Amendment inquiry cannot turn on the quantity of information a particular query returns. Consistent with these principles, the Court should hold that the retrospective query here constituted a search. But if further findings are warranted, the Court should vacate the suppression ruling and remand for application of the correct Fourth Amendment framework.

Respectfully submitted,

Gene C. Schaerr
*Counsel of Record*
Erik S. Jaffe
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*

Dated: October 8, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,754 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Office in 14-point Century Schoolbook font.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amicus Curiae*

Dated: October 8, 2026

## ECF CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28A(h)(2)

I hereby certify that the ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program and, according to the program, is free of viruses.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amicus Curiae*

Dated: October 8, 2026

## CERTIFICATE OF SERVICE

Under Fed. R. App. P. 25(d), I hereby certify that on October 8, 2026, this Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served through the Court's electronic filing system.

I further certify that on October 9, 2026, one paper copy of the foregoing Brief, will be served on counsel for each represented party, as required by Local Rule 28A(d), by overnight commercial carrier to the following:

Ryan D. Sandberg
PRINGLE & HERIGSTAD
2525 Elk Drive, P.O. Box 1000
Minot, ND 58702-1000
*Counsel for Appellant*

Matthew P. Kopp,
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF NORTH DAKOTA
655 First Avenue, N., Suite 250
Fargo, ND 58102-4932
*Counsel for Appellee*

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amicus Curiae*